866 P.2d 1156

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Matthew James GRIFFIN,
Defendant–Appellant.**

No. 19781.

Supreme Court of New Mexico.

Nov. 18, 1993.

Sammy Quintana, Chief Public Defender and Susan Gibbs, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Tom Udall, Atty. Gen. and Elizabeth Blais-dell, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

OPINION

RANSOM, Chief Justice.

*Matthew James Griffin* appeals his convictions of felony murder, aggravated burglary, five counts of armed robbery, and tampering with evidence. The five armed robberies were bank holdups; the aggravated burglary was an attempted car theft; the felony murder occurred in the course of the attempted car theft; and the tampering-with-evidence conviction involved the dismantling of a gun. The armed robbery and aggravated burglary sentences were enhanced due to use of a firearm. Griffin was sentenced to life imprisonment for the murder and, consecutively, to fifty years imprisonment for the enhanced burglary and robbery convictions. We affirm.

*Operative Facts.* On January 21, 1988, a grey Camaro with a National Guard license plate was stolen in Albuquerque. The next day, an Albuquerque branch of New Mexico Federal Savings and Loan was robbed. The robber wore clothing that covered his entire body, including gloves, sunglasses, and a mask, and he carried a black automatic-type pistol and a walkie-talkie or radio. The robber jumped onto and then over the teller counter and told the tellers to put money in his gym bag. He drove away in a grey Camaro with a license plate similar to the one on the stolen Camaro. Witnesses described the robber as being five feet, ten inches to six feet tall, weighing between 150 and 180 pounds, athletic, and light-skinned. Griffin is five feet, eleven inches tall, weighs 160 pounds, and is anglo.

The second bank robbery was of a Sun Country Savings Bank on June 28, 1988. The robber again jumped onto and then behind the teller counter. He wore black clothing, gloves, sunglasses, and a ski mask. He had a "radio-type thing" on his belt with a wire attached to a set of earphones. The robber put the money into his gym bag and made his escape in a grey or silver Camaro with a Colorado license plate. Two witnesses testified that the getaway car matched a photograph of the stolen grey Camaro.

The third bank robbery occurred on September 21, 1988 at a Western Bank location. The robber wore dark clothing, gloves, a ski mask, and headphones, and he had the money put into a knapsack or gym bag. He carried an Uzi-type gun with a shroud and a brass catcher (a basket-type attachment to catch empty shell casings). Griffin had purchased a weapon of that type in 1988. The robber left the bank in a grey, silver, or black Camaro with a Colorado license plate, but the license number was different than that seen in the second bank robbery. Again, two witnesses testified that the car used by the robber matched a photograph of the stolen grey Camaro.

Authorities recovered the grey Camaro on November 10, 1988. On December 30, 1988, a rust-colored Camaro was stolen. When the rust Camaro was recovered on February 13, 1989, it had a hole drilled into the plastic molding on the driver-side window that had not been there previously, and the ignition-switch area of the steering column was broken out.

In the meantime, the fourth bank robbery occurred at a First Interstate Bank on January 19, 1989. The robber wore black clothes, gloves, sunglasses, a ski mask, and a gun and holster on a black webbed belt. The gun was a semi-automatic or automatic-type pistol that looked like a Glock pistol. The robber jumped over the counter and ordered the tellers to place money into his gym bag. He left the bank in a rust or maroon Camaro with no license plate. Present at the bank during this robbery was Willis Drake, a convenience store manager. Drake told an FBI agent at the scene that he recognized the robber's voice, but could not yet place it. When he returned to work, he told an employee that the voice was that of Matt Griffin, who had been coming into the store two or three times a week for several months to buy coffee and donuts.

On April 3, 1989, an unsuccessful attempt was made to steal a Trans Am in the parking lot of an apartment building. The Trans Am had a hole drilled into the plastic molding on the driver-side window and the ignition-

switch area was broken out. A resident of the apartment building, Michael Howard, was found shot to death next to the car, apparently having approached the car before the theft could be completed. Howard had been shot four times with a .9 millimeter pistol.

The fifth robbery occurred when the Sun Country Savings that had been robbed the previous June was robbed again on April 17, 1989. Again the robber was dressed in black clothes, gloves, sunglasses, and a ski mask, wore earphones, and had a box on his hip. He used a gym-type bag for the money. The robber drove away in a wine or maroon-colored Camaro with no license plate. Later that day, FBI agents investigating the robbery spotted a car matching the description, but with a license plate, in the driveway of Griffin's home. Griffin told the agents that the car was his. Witnesses identified a photograph of Griffin's Camaro as the car driven by the April 17 robber.

*–The bank robberies were similar and distinctive.* All of the bank robberies took place on or near Juan Tabo Boulevard in the Northeast section of Albuquerque. Griffin was not at work on any of the dates when the bank robberies occurred. The robber in each case used a similar method of operation and drove away in a car that in the first four robberies matched the description of recently-stolen cars, and in the fifth matched the description of Griffin's car.

Julian Gonzales, an FBI agent, testified that the five bank robberies were the first ones using that particular modus operandi in Albuquerque or other western locations. Between the time of Griffin's arrest and the trial, no robberies using the same method of operation occurred. The total amount taken from the five banks was over $35,000.

*–Two of the car thefts were similar and distinctive.* The grey Camaro was stolen while it was unlocked and the keys were in it, so there was no need for the thief to break in and start the engine without a key. However, the modi operandi of the theft of the rust Camaro and the attempted theft of the Trans Am were identical. An expert witness with fifteen years of experience investigating car thefts testified that he had never before seen that method of drilling a hole into the plastic molding, and no reference to such a method was found on file in the National Automobile Theft Bureau. A bent rod that could be inserted through the hole to reach the electric door-lock release was found among the items seized from Griffin's house, as was a cordless drill and a drill bit with plastic residue matching the plastic molding on the two stolen cars.

*–The guns.* The five bank robberies involved different guns, including a Glock pistol and an Uzi handgun. Sometime between December 1987 and February 1989, a Glock 17 pistol disappeared from the evidence room of the Albuquerque Police Department ("APD"). Griffin worked in the evidence room during the summer of 1988. Griffin had at least three New Mexico driver's licenses (two with false names and addresses), and he had used false identification in purchasing one or more guns. In early 1989 Griffin purchased two Glock 19 pistols. An expert testified that Glock pistols are very easy to take apart, that the serial number is stamped on three places on each gun (on the frame, the slide, and the barrel), and that some parts of the gun are interchangeable.

Before his arrest, Griffin contacted Dave McCutcheon. He told McCutcheon that he was concerned that he was under investigation and asked McCutcheon to hold some guns for safekeeping. McCutcheon agreed, and Griffin gave him a Glock pistol, an Uzi, and a shotgun. McCutcheon contacted the police and turned the guns over to them. The serial numbers stamped on the Glock's frame and slide were the same, but the barrel was stamped with a different number. Marks on shell casings found by Howard's body matched marks made by the ejector on the Glock to the exclusion of all other slides. Marks on casings made by the firing pin in the Glock also matched marks made by the firing pin of the pistol that had disappeared from the APD evidence room.

*–Miscellaneous evidence.* When Griffin was arrested, the police seized articles of clothing like those worn by the robber including a ski mask, a black webbed belt with a holster for a Glock pistol, guns that

matched descriptions of those used in the robberies, a police scanner and a set of headphones, a toolbox containing keys that fit the stolen grey Camaro, and black canvas bags. In addition, between the time of the first bank robbery and his arrest, Griffin had used cash to make several large purchases, including guns and several cars.

■ *It was not error to deny the motion to sever the charges.* Before the trial began, the trial court denied Griffin's motion asking that the charges for armed robbery be severed and tried separately. Our rules of criminal procedure authorize joinder of two or more offenses in one complaint, indictment, or information if the offenses "are of the same or similar character, even if not part of a single scheme or plan" or if the offenses are "based on the same conduct or on a series of acts either connected together or constituting parts of a single scheme or plan." SCRA 1986, 5–203(A) (Repl. Pamp.1992). As noted in our recitation of the facts, the bank robberies were similar and distinctive and the cars used in the bank robberies were stolen using a distinctive method. The tampering-with-evidence charge involved altering or hiding a gun allegedly used in both the murder and the bank robberies. All of the charges were clearly related to crimes that were the same, similar, a series of connected acts, or part of a single scheme or plan. Thus, all of the crimes charged were subject to joinder under Rule 5–203(A).

■ A motion for severance should be granted by the trial court if it appears that either a defendant or the state will be prejudiced by joinder of offenses. SCRA 1986, 5–203(C). We will not overturn an exercise of the court's discretion in denying the motion unless there was prejudice to the defendant. *State v. Burdex*, 100 N.M. 197, 203–04, 668 P.2d 313, 319–20 (Ct.App.), *cert. denied*, 100 N.M. 192, 668 P.2d 308 (1983). We have stated:

> It is no abuse of discretion to deny a motion to sever multiple counts . . . when [the defendant] contends that a single trial is violative of the "other crimes" test set out in [SCRA 1986, 11–404(B) ], if substantial evidence supports each conviction, the

evidence is relevant to each of the charges being tried, and the jury evaluates the evidence in terms of each count.

*Burdex*, 100 N.M. at 203, 668 P.2d at 319 (citation omitted). Here, the evidence is sufficient to support each conviction and there is no allegation that the jury failed to evaluate the evidence in terms of each count. There is nothing in the various charges that unfairly prejudiced Griffin. Much of the evidence of the various crimes would have been admissible in each separate trial for the same reasons that support joinder of the charges. *See* SCRA 1986, 11–404(B) (evidence of other crimes is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, or identity); *see also State v. Garcia*, 80 N.M. 21, 23, 450 P.2d 621, 623 (1969) (evidence of collateral offenses, even if prejudicial, is admissible if it tends to identify person on trial). Therefore, we find no abuse of the trial court's discretion in denying Griffin's motion for severance.

*Substantial evidence arguments.* Griffin alleges that the evidence is insufficient to support the findings that he was the perpetrator of the crimes, and insufficient to prove two elements necessary for a felony murder conviction—the existence of an underlying, inherently dangerous felony and intent to kill. "Substantial evidence is that evidence which is acceptable to a reasonable mind as adequate support for a conclusion." *State v. Isiah*, 109 N.M. 21, 30, 781 P.2d 293, 302 (1989).

> [T]he test to determine the sufficiency of evidence . . . is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction. A reviewing court must view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict. This court does not weigh the evidence and may not substitute its judgment for that of the fact finder so long as there is sufficient evidence to support the verdict.

*State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988) (citations omitted).

■ *–Evidence linking Griffin to the crimes is sufficient to support the verdicts.* Griffin attacks his identification as the bank robber and murderer by attacking the credibility of Drake and other eyewitnesses and by reciting some of the weaker evidence presented by the State. He fails to acknowledge, however, testimony by two tellers at New Mexico Federal that they recognized the robber as a man who had been in the bank the week before the robbery and that they believed Griffin was that man, the evidence that the gun seized from his possession was linked to Howard's murder, and other evidence that linked him to the crimes. We do not acknowledge Griffin's challenges to the credibility of witnesses or his arguments about the weight to be given their testimony. *See State ex rel. Moreno v. Floyd,* 85 N.M. 699, 703, 516 P.2d 670, 674 (1973) (noting that this Court has long recognized that the trier of fact is better able to determine witness credibility and the weight to be given witness testimony than an appellate court). Although Griffin failed to set out fully the substance of the evidence against him, *see* SCRA 1986, 12–213(A)(3) (Repl.Pamp.1992), the overwhelming evidence against him as recited above is adequate for this Court's review. Viewing the evidence in the light most favorable to the verdict, *see Sutphin,* 107 N.M. at 131, 753 P.2d at 1319, we find that there was sufficient evidence to support identification of Griffin as perpetrator of the crimes for which he was convicted.

*–Evidence in support of felony murder.* Griffin makes two challenges to the sufficiency of the evidence to support his conviction for felony murder. He argues that the evidence supports neither the use of aggravated burglary as the predicate felony nor a finding of intent.

■ *—The evidence supports a finding that Griffin committed aggravated burglary.* The felony underlying Griffin's felony-murder conviction is the crime of aggravated burglary, set out in NMSA 1978, Section 30–16–4 (Repl.Pamp.1984). That section defines the crime, in relevant parts, as "the unauthorized entry of any vehicle ... with intent to commit any felony or theft therein and the person either: A. is armed with a deadly weapon ... [or] C. commits a battery upon any person while in such place, or in entering or leaving such place." Griffin argues that, while the State may have proved that he broke into the Trans Am and that he intended to steal it, the State failed to prove that he intended to commit a felony or theft "in" the car. The central point of his argument is that "therein" refers only to property within the vehicle and not the vehicle itself. "Therein" means "in that place." *State v. Stephens,* 601 So.2d 1195, 1196 (Fla.1992) (holding "therein" in Florida burglary statute encompasses entering a car with intent to steal the car). If we substitute "in that place" for "therein" in the statute, we find that one element of the crime is an unauthorized entry with intent to commit a felony or theft in a car.

> The use of the word "therein" plainly indicates that the crime of burglary can exist if the defendant formed an intent to commit a crime "in that place." There is no requirement that the crime must be one that can be completed solely within the fixed limits of that particular place, only that the crime is intended to be committed there. This obviously can include an intent to commit car theft, because such a crime can be committed "in that place."

*Stephens,* 601 So.2d at 1196; *see also People v. Sansone,* 94 Ill.App.3d 271, 49 Ill.Dec. 842, 844, 418 N.E.2d 862, 864 (1981). Breaking into a car with the intent to steal the car qualifies as an intent to commit a theft "therein."

■ *–The facts demonstrate conclusively that Griffin had sufficient intent to support his conviction for felony murder.* In previous cases, this Court has held that failure to instruct the jury on an essential element of a crime for which the defendant has been convicted may constitute fundamental error. *See, e.g., State v. Osborne,* 111 N.M. 654, 661–62, 808 P.2d 624, 631–32 (1991). Such a failure does not necessarily amount to fundamental error.

> Clearly, when a jury's finding that a defendant committed the alleged act, under the evidence in the case, necessarily includes or amounts to a finding on an element omitted from the jury's instructions, any

doubt as to the reliability of the conviction is eliminated and the error cannot be said to be fundamental. The trial court's error in failing to instruct on an essential element of a crime for which defendant has been convicted, where there can be no dispute that the element was established, therefore does not require reversal of the conviction.

*State v. Orosco*, 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992).

Griffin argues that the evidence is insufficient to support his conviction for felony murder on the element of intent. *See State v. Ortega*, 112 N.M. 554, 563, 817 P.2d 1196, 1205 (1991) (holding that proof of intent to kill is required to support a conviction for felony murder). Since this case had gone to trial before our opinion in *Ortega* issued, the jury was not instructed that it had to find intent, but was given the same Uniform Jury Instruction for felony murder as had been given in *Ortega* and *State v. Hernandez*, 115 N.M. 6, 846 P.2d 312 (1993). In addition to the deficient instruction on felony murder, the juries in this case, *Ortega*, and *Hernandez* were given a jury instruction for willful and deliberate murder in the first degree.

■ The felony-murder intent requirement is satisfied if there is proof that the defendant intended to kill, knew that his actions created a strong probability of death or great bodily harm to the victim or another person (as required for second-degree murder, *see* NMSA 1978, § 30-2-1(B) (Repl. Pamp.1984)), or acted in a manner greatly dangerous to the lives of others. *Ortega*, 112 N.M. at 566, 817 P.2d at 1208. In other words, intent sufficient to support a conviction for another type of murder generally would support a felony-murder conviction. *See Ortega*, 112 N.M. at 563, 817 P.2d at 1205.

As in *Ortega* and *Hernandez*, the jury here returned a not-guilty verdict on willful and deliberate murder and a guilty verdict on felony murder. We affirmed the convictions in both *Ortega* and *Hernandez*, finding that even though the juries were not instructed on the element of intent, the jury in each case undoubtedly would have found intent had it been correctly instructed. *See Ortega* 112 N.M. at 566-67, 817 P.2d at 1208-09 (holding facts of case did not require re-trial for failure to instruct on intent because the result surely would be the same); *Hernandez*, 115 N.M. at 24, 846 P.2d at 330 (holding that act of holding pillow over victim's face for several minutes created a strong probability of death or great bodily harm).

■ We face the same situation here. The jury found that Griffin, while attempting to steal the Trans Am, shot Michael Howard four times in the chest and neck at close range. This finding necessarily established that Griffin did so with knowledge that his actions created a strong probability of death or great bodily harm to the victim.[1] We "not only have confidence in the jury's verdict ... we think it would be a miscarriage of justice to upset the verdicts and remand for a new trial, the outcome of which most assuredly would be the same." *Ortega*, 112 N.M. at 566-67, 817 P.2d at 1208-09; *see also Payne v. LeFevre*, 825 F.2d 702, 708-09 (2nd Cir.), *cert. denied*, 484 U.S. 988, 108 S.Ct. 508, 98 L.Ed.2d 506 (1987) (holding no rational jury could fail to find intent to seriously injure or kill when defendant fired a shotgun at his victim at point-blank range). We hold that the jury's finding that Griffin shot Howard at close range necessarily established an indisputable finding that Griffin intended death or great bodily harm to Howard.

■ *Dismissal of juror and replacement with alternative juror.* The court had at least one alternate juror seated at the jury-selection phase of the trial. Near the end of the trial, the court dismissed a seated juror for cause and replaced her with an alternate juror for the jury's deliberations. *See* SCRA 1986, 5-605(B) (Repl.Pamp.1992) (when alter-

---

1. We do not rely specifically on it, but the jury did make a finding that Griffin intended to kill Howard. After the jury had returned its verdict on Griffin's guilt, a separate sentencing proceeding was held to determine whether Griffin should receive the death penalty for the felony murder. In that proceeding, no additional evidence was heard and the jury was asked if it found aggravating circumstances that might justify the death penalty. While it did not return the death penalty, the jury unanimously found that Griffin intended to kill Howard.

nate jurors have been impanelled, court shall replace any juror that becomes or is found to be unable or disqualified to perform juror's duties with alternate before the jury retires to consider its verdict). Griffin challenges the procedure followed by the court and the grounds for dismissing the juror.

According to the record, the court spoke to the replaced juror about her behavior on several occasions. On the last day of trial, the juror requested permission to leave the courthouse and was seen roaming the court-house halls in violation of the court's seques-tration order. The court excused the juror and selected an alternate. Griffin asked the court to investigate the latest allegation and objected to the excusal. Griffin argues on appeal that the excusal was improper be-cause communications with a juror should be on the record. *See Hovey v. State,* 104 N.M. 667, 669–70, 726 P.2d 344, 346–47 (1986) (stating that defendant has a right to be present for all communications with the jury concerning issues in the case and any im-proper communication raises presumption of prejudice). He apparently objects to the fact that the juror had an off-the-record conver-sation with the bailiff about personal matters that the court may have considered in excus-ing the juror.

Griffin does not allege that the alternate juror was unfair or that the jury that decided the case was unfair. Absent an allegation of prejudice or an off-the-record conversation involving the subject matter of the court's proceedings, this Court will not examine whether the court abused its discretion in replacing the juror. *Cf. State v. Gilbert,* 100 N.M. 392, 397, 671 P.2d 640, 645 (1983) (af-firming trial court's removal of juror and replacement with alternate where there was no prejudice to defendant and no abuse of court's discretion), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984); *State v. Bojorquez,* 88 N.M. 154, 156, 538 P.2d 796, 798 (Ct.App.) (stating that when defendant failed to establish prejudice caused by the inability of a juror to perform his duties, he could not challenge court's ruling regarding replacement of juror with alter-nate), *cert. denied,* 88 N.M. 318, 540 P.2d 248 (1975).

■ *Jury "experimentation" not error.* At the beginning of the trial the jury was instructed that it could not "make experi-ments with reference to the case." *See* SCRA 1986, 14–101 (Cum.Supp.1993). Dur-ing deliberations the jury requested and was sent, over Griffin's objection, a magnifying glass. At the same time, the jury asked to see photos of the robberies taken by the bank surveillance cameras. Griffin argues that use of the magnifying glass introduced extraneous information and constituted im-proper experimentation by the jury. A jury's verdict should be based solely on the evidence admitted, not on the jury's knowl-edge obtained from extraneous sources. *See State v. Sacoman,* 107 N.M. 588, 591, 762 P.2d 250, 253 (1988).

■ The magnifying glass allowed the ju-rors to more closely examine evidence that was introduced, presumably the photographs. Enhancement of the jury's visual acuity through use of a magnifying glass is not experimentation unless there is some indica-tion that the magnification produced addi-tional evidence. *See Taylor v. Reo Motors, Inc.,* 275 F.2d 699, 705 (10th Cir.1960) (ex-plaining that the salient question is whether a jury's investigation or experiment out of the presence of the parties is within the scope or purview of the evidence introduced or amounts to taking evidence); *People v. Turner,* 22 Cal.App.3d 174, 99 Cal.Rptr. 186, 191 (1971) (reasoning that jurors' use of mag-nifying glass to examine photographs admit-ted into evidence was only extension of ju-rors' sense of sight); *see also* Carroll J. Miller, *Propriety of Juror's Tests or Experi-ments in Jury Room,* 31 A.L.R. 4th 566 (1984) and cases cited therein. There is no indication that the glass was used experimen-tally or that it distorted any of the evidence, thus there was no error in allowing the jury to use the magnifying glass.

■ *Firearm enhancement does not im-plicate double jeopardy.* Griffin's sentences for armed robbery and aggravated burglary were enhanced due to the use of a firearm in their commission. *See* NMSA 1978, § 31–18–16(A) (Cum.Supp.1993) (upon separate finding of fact that firearm was used in a

noncapital felony, the basic sentence is increased; the increased portion of the sentence cannot be suspended or deferred). Griffin urges this Court to find that firearm enhancement constitutes double jeopardy under the analysis set out in *Swafford v. State*, 112 N.M. 3, 810 P.2d 1223 (1991). Following that analysis, we find no violation of double jeopardy because Section 31–18–16 is a clear expression that the legislature intends increased punishment when a firearm is used in a robbery or burglary. *See State v. Gabaldon*, 92 N.M. 230, 234, 585 P.2d 1352, 1356 (Ct.App.) (holding firearm enhancement statute shows legislative intent to increase punishment for firearms as compared to other deadly weapons), *cert. denied*, 92 N.M. 260, 586 P.2d 1089 (1978); *see generally Swafford*, 112 N.M. at 14, 810 P.2d at 1234 (upon finding of express legislative provision for multiple punishment, double jeopardy inquiry ceases).

■ *Cumulative error.* Griffin argues that several evidentiary and motion rulings that might be harmless individually constitute prejudicial error when taken as a whole. The doctrine of cumulative error "requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Martin*, 101 N.M. 595, 600–01, 686 P.2d 937, 942–43 (1984). When there is no error, however, there can be no accumulation. *See id.* We examine each of the alleged errors to see if they were in fact error, then determine if the actual errors accumulated to deprive Griffin of a fair trial. The first four of these alleged errors concern evidentiary questions. Admission of evidence generally is within the discretion of the trial court and is reversed only for clear abuse of that discretion. *See State v. Worley*, 100 N.M. 720, 723, 676 P.2d 247, 250 (1984).

  *–The car keys.* A set of car keys that fit the stolen grey Camaro was found in Griffin's residence and introduced into evidence. Griffin argues that the State failed to show a proper chain of custody for the keys. After a chain-of-custody hearing outside the presence of the jury, the court, satisfied that the State met its burden, admitted the evidence.

Griffin had the opportunity to cast doubt on the credibility of the evidence. We have reviewed the record and hold that the trial court did not abuse its discretion in admitting the evidence.

■ *–Evidence as to "similarity."* There was physical evidence admitted and testimony given to the effect that articles of clothing found in Griffin's possession, photographs of cars, and guns were "similar" to those seen by witnesses at the bank robberies even though the witnesses could not definitively state that they were the same ones used. Griffin attacks this evidence as irrelevant and unfairly prejudicial. We agree with the State that the evidence was properly used as circumstantial evidence to show that Griffin had the ability or opportunity to commit the crimes. Without close inspection at both the crime scene and the trial, no witness could state unequivocally that a particular gun, article of clothing, or common model of car was exactly the same one seen at the crime. Griffin's argument goes not to the admissibility of the items, but to their weight. We find no abuse of discretion in admitting the exhibits and the testimony regarding their similarity to items used in the crimes.

■ *–Willis Drake's testimony.* Willis Drake, who managed a Circle K convenience store, was a witness to one of the bank robberies. He testified that he recognized the robber's voice as that of Griffin, whom he knew as a customer. Griffin's challenge again goes not to the admissibility of the testimony, but to its credibility, which Griffin had ample opportunity to attack at trial. The trial court did not abuse its discretion in allowing the testimony.

Griffin asked the trial court to allow him to attack the credibility of Drake's identification of Griffin's voice by using a tape recording of Griffin's voice along with other voices. The trial court initially denied the request, but expressly left open the possibility that Griffin might be able to establish a sufficient foundation to make the recording admissible. Griffin made no further efforts to establish such a foundation and now asserts that the trial court erred. We find no abuse of discretion in the trial court's refusal to admit evidence

it deemed unreliable. Griffin's failure to take the opportunity to establish a proper foundation supports the court's ruling.

*–Cross-examination of Dave McCutcheon.* The credibility of any witness may be challenged. SCRA 1986, 11–607, 11–608(A). Dave McCutcheon was a witness for the State. The State filed a motion in limine to restrict his cross-examination. The trial court heard argument as to what areas of McCutcheon's past could be addressed on cross-examination and ruled that Griffin's attorney should approach the bench before he inquired into any of those areas. On appeal, however, Griffin does not point to any specific instance when he attempted to question McCutcheon but was restricted by the court. Because Griffin's attorney was not restricted in his questioning at trial, we cannot find error.

■ *–Phone conversations between Griffin and McCutcheon.* Griffin objects to the admission of two telephone conversations between himself and McCutcheon. Both conversations occurred before Griffin had been taken into custody and before any judicial proceedings of any sort had been initiated in this case, although he had retained counsel. The first conversation was initiated by McCutcheon and was heard over a speakerphone by police officers, and the second was initiated by McCutcheon at police request and was tape recorded. Properly, the court ruled that Griffin was not entitled to *Miranda* warnings before he had the conversations, *see Illinois v. Perkins,* 496 U.S. 292, 294, 110 S.Ct. 2394, 2395–96, 110 L.Ed.2d 243 (1990) (holding *Miranda* warnings not required when suspect is unaware he is speaking to law enforcement officer and gives a voluntary statement), and that because there were no pending formal charges against Griffin, his right to counsel had not attached, *see Maine v. Moulton,* 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985); *State v. Aragon,* 109 N.M. 632, 635–36, 788 P.2d 932, 935–36 (Ct.App.), *cert. denied,* 109 N.M. 563, 787 P.2d 1246 (1990). As to one comment made on a tape-recorded conversation regarding another shooting, Griffin agreed to a limiting instruction that was given. We

find no abuse of the court's discretion in admitting the two conversations.

■ *–Comments by prosecution during closing argument.* Griffin did not object to comments made by the State during its closing arguments, yet he now asks this Court to review portions of that statement as part of his allegation of cumulative error. Error in allowing statements made in closing argument without objection does not require reversal unless it amounts to fundamental error. *State v. Chamberlain,* 112 N.M. 723, 730, 819 P.2d 673, 680 (1991). We review comments made during closing arguments in context so that we may understand the comments and their potential effect on the jury. *See e.g., State v. Compton,* 104 N.M. 683, 687–92, 726 P.2d 837, 841–46, *cert. denied,* 479 U.S. 890, 107 S.Ct. 291, 93 L.Ed.2d 265 (1986). Griffin argues that the State shifted the burden of proof to Griffin, commented on inadmissible evidence, and injected extraneous matter into the case. Reviewing the full context of the closing argument, we find no fundamental error in allowing the statements themselves. We also find no accumulation of errors amounting to fundamental error in this case.

■ *–Error alleged in court's refusal to change venue or, alternatively, to completely sequester the jury.* Griffin argues that it was an abuse of discretion for the trial court to refuse his request to change venue. He points out that the case was highly publicized both before and during trial. We have held that "exposure to pretrial publicity, by itself, does not require a change of venue and does not raise a presumption of prejudice." *Hernandez,* 115 N.M. at 21, 846 P.2d at 327 (citing *Chamberlain,* 112 N.M. at 726, 819 P.2d at 676). While alleging that the jurors were aware of the case, Griffin made no allegation and offered no evidence that the publicity affected the jury's ability to impartially judge his guilt or innocence. Nor has he shown how failure to sequester the jury during a trial that lasted from the end of October until the middle of January caused the jury to lose its impartiality. Because he has failed to show or even allege specifically that he was prejudiced by the court's actions, we find no abuse of discretion. *See Hernan-*

*dez,* 115 N.M. at 21–22, 846 P.2d at 327–28 (holding that defendant who failed to meet burden of showing abuse of discretion cannot prevail on challenge to court's refusal to change venue).

 *–Error in drawing the pool of jurors on the grand jury or the trial jury from the list of registered voters rather than from driver's license records.* This issue is controlled by *State ex rel. Stratton v. Serna,* 109 N.M. 1, 3, 780 P.2d 1148, 1150 (1989), and *State v. Gonzales,* 112 N.M. 544, 548–49, 817 P.2d 1186, 1190–91 (1991), where this Court held that it was not error for jurors to be pulled from the list of registered voters for trials before the new law, NMSA 1978, § 38–5–3 (Cum.Supp.1993), went into effect.

*Ineffective assistance of counsel.* Griffin perfunctorily asks this Court to review a question of ineffective assistance of counsel on the face of the record in this case. Because he did not specify which acts or omissions were ineffective, he has not carried his burden. *See* SCRA 1986, 12–213(A)(3) (argument must contain the contention with parts of record proper, transcript, or exhibits relied on); *Hernandez,* 115 N.M. at 16, 846 P.2d at 322 (stating that defendant has burden of proving that his attorney's acts or omissions fell below standard of competency).

*Conclusion.* We affirm the convictions of Matthew J. Griffin on all counts.

IT IS SO ORDERED.

BACA and FROST, JJ., concur.