1997–NMSC–019

934 P.2d 1057

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Carl LIVERNOIS, Defendant–Appellant.**

**No. 22296.**

Supreme Court of New Mexico.

Feb. 26, 1997.

T. Glenn Ellington, Chief Public Defender, Susan Roth, Assistant Appellate Defender, Santa Fe, for Appellant.

Tom Udall, Attorney General, Jennifer L. Stone, Assistant District Attorney, Santa Fe, for Appellee.

## OPINION

BACA, Justice.

1. Appellant Carl Livernois appeals his convictions for the first-degree murder, NMSA 1978, § 30-2-1(A) (Repl.Pamp.1994), and aggravated burglary, NMSA 1978, § 30-16-4(A) (Repl.Pamp.1994), that occurred March 4, 1991, at Ideal Bowling Lanes in Rio Rancho. Appellant received a life sentence for the murder conviction and a nine-year sentence for aggravated burglary. We address the following issues on appeal: (1) whether the district court properly instructed the jury on all the essential elements of first-degree, felony murder; (2) whether the imposition of sentences for both first-degree murder and aggravated burglary violates the constitutional guarantee against double jeopardy; and (3) whether the State violated the Interstate Agreement on Detainers when it did not bring Appellant to trial within the prescribed 120-day limit, NMSA 1978, § 31-5-12, art. 4(C) (Repl.Pamp.1984). We note jurisdiction under SCRA 1986, 12-102(A)(2) (Repl.Pamp.1992) (directing to Supreme Court appeals from district courts in which sentence of life imprisonment has been imposed), and affirm.

## I.

2. Early in the morning of March 4, 1991, Al Faudie arrived at work at Ideal Bowling Lanes bowling alley. James Chapman, a custodian at the bowling alley, had already arrived and was cleaning up after the night before. The lights of the bowling alley were off except for a light over the bowling pit area and a light in the business office. Faudie testified that after he arrived and began working at his desk, he heard loud voices outside the office. Faudie stepped out of his office to investigate. He looked down the concourse and saw two figures down the hallway, recognizing Chapman as one of the figures. Faudie did not recognize the other figure. Immediately after recognizing Chapman, Faudie heard Chapman say, "Al, call the cops, he has a gun." Faudie then heard another voice say, "I told you to get down on the floor." Before Faudie had a chance to react, he saw a flash of a gun and heard a pistol report. Faudie ran back into his office, locked the door and ran for the telephone. Faudie then heard two more gunshots, maybe three, in quick succession.

3. At about that same time, Ted Bonnell, another Ideal Lanes employee, arrived at the bowling alley. As he got out of his car, he heard a banging noise, like metal hitting metal. He entered the west end of the building and noticed a mop bucket and lights in the restroom and said "Good morning, Jim," but received no answer. He then noticed someone going out the back door on the east side of the building and thought it was Chapman going outside to empty the trash. Bonnell then went into the office and saw Faudie, hiding behind a desk and looking "scared to death." Faudie told Bonnell that there had been a shooting in the bowling alley, and Bonnell called the police. Afterward, they stepped out of the office and found Chapman lying on the concourse floor. Chapman had been shot once in the head and once in the

right arm and died at the hospital several hours later. It was determined that he was shot with either a .357 or a .38 caliber revolver. One investigating police officer reported finding bicycle tracks outside the back door of the bowling alley.

4. Tomi Jo Delaney testified that at approximately the same time that police were responding to a call from the bowling alley, Appellant arrived on his bicycle at her home. Tomi Jo's son, Elvis Delaney, and Appellant were inmates together before Appellant was released. Appellant had been living with Tomi Jo since his release two months earlier. At the time that Appellant arrived home, Tomi Jo was just about to leave to take her niece and son to school and also to stop by the juvenile probation office. She asked Appellant if he would go with her, and Appellant agreed. While they were at the juvenile probation office, they learned about the shooting at the bowling alley. Tomi Jo jokingly asked Appellant if he had anything to do with the shooting, to which Appellant responded, "Yeah, but they can't prove what I did." A few days later, Appellant approached Tomi Jo with a copy of the Rio Rancho newspaper containing an article about the shooting at the bowling alley. Appellant said to Tomi Jo, "This is what I did. This is what happened."

5. Elvis Delaney recalled that during a telephone conversation with his mother, she was upset and had told him that Appellant had killed somebody. Elvis asked to speak with Appellant. Appellant told Elvis that he had a pistol and had shot somebody at a bowling alley. Appellant also told Elvis, "The guy wanted to play hero, so I shot him." Elvis ordered Appellant to get out of his mother's house. Appellant did and fled to Florida. During a later telephone conversation with Appellant, Elvis recalled that Appellant said he had thrown the pistol in a lake in Florida.

6. David Clark met Appellant while they were in prison together in Las Cruces. They spent five years together before Appellant was released in January 1991. Shortly after Clark was released from prison, he returned to his hometown in Florida. There, he and Appellant rented a mobile home as roommates. Clark testified that Appellant had a canvas carrying bag, which Appellant kept in his car or inside their home. Clark saw numerous items in the bag, including a .357 pistol, a holster for the pistol, and .38 wadcutter bullets. Clark also testified that one day he came home and found Appellant grinding the inside of the .357 pistol, destroying the rifling in the barrel, and disassembling the gun into three pieces. Appellant said that he received a telephone call from someone in New Mexico telling him that he was wanted for questioning about a murder and that he was destroying the pistol so authorities could not take a ballistics test. We will state additional material facts as they become relevant to each issue we discuss below.

7. On October 29, 1991, a complaint and arrest warrant were filed, charging Appellant with murder. On September 19, 1993, Appellant arrived in New Mexico from Florida, pursuant to the Interstate Compact on Detainers. On October 21, 1993, Appellant was indicted for murder, and the indictment included a firearm enhancement. After trial, at which Appellant presented no evidence, the jury received instructions for first-degree premeditated murder and for first-degree felony murder. The jury returned a general verdict of first-degree murder and a verdict of aggravated burglary. Appellant now appeals.

## II.

8. We address whether the trial court erred by instructing the jury on felony murder without requiring a finding that Appellant intended to murder Chapman. In addition to receiving an instruction for first-degree, premeditated murder, the jury received the following instruction for first-degree, felony murder:

For you to find the defendant guilty of felony murder, which is first degree murder, as charged in Count 1, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

1. The defendant committed the crime of aggravated burglary under circumstances or in a manner dangerous to human life;

2. During the commission of the aggravated burglary the defendant caused the death of James Chapman.

3. This happened in New Mexico on or about the 4th day of March, 1991.

Appellant relies on *State v. Ortega*, 112 N.M. 554, 817 P.2d 1196 (1991), to argue that felony murder requires the same element of intent to kill or knowledge of risk that is an element of second-degree murder. Appellant further argues that by not instructing the jury to find the requisite element of intent, Appellant's conviction of first-degree murder cannot stand.

■■■ 9. In *Ortega*, this Court held that

[A]ny presumption which establishes a fact essential for conviction of the crime by proof of another fact, or which shifts to the defendant the burden of persuasion that the essential fact is not true, runs afoul of the Due Process Clause by conflicting with " *'the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime.'* "

.        .        .        .        .

[u]nder the [felony murder] statute so construed, proof that a killing occurred during the commission or attempted commission of a felony will no longer suffice to establish murder in the first degree. In addition to proof that the defendant *caused* (or aided and abetted) the killing, there must be proof the defendant *intended* to kill (or was knowingly heedless that death might result from his conduct).

*Id.* at 563, 817 P.2d at 1205 (quoting *Sandstrom v. Montana*, 442 U.S. 510, 522, 99 S.Ct. 2450, 2458, 61 L.Ed.2d 39 (1979)) (citation omitted). Notwithstanding the on-going debate surrounding the rightness of the felony murder doctrine, *see, e.g.*, Nelson E. Roth & Scott E. Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell L.Rev. 446 (1985) (discussing criticisms and dissatisfactions with felony-murder doctrine), or whether due process requires proof of intent for felony-murder conviction,

*see, e.g., Ortega*, 112 N.M. at 575, 817 P.2d at 1217 (Baca, J., dissenting) (disagreeing that "our statute must be construed to require proof of intent to kill for there to be criminal liability for first degree[, felony] murder"), New Mexico now requires that for a felony-murder conviction, the jury must find "an intent to kill in the form of knowledge that the defendant's acts 'create a strong probability of death or great bodily harm' to the victim or another." *Id.* at 563,. 817 P.2d at 1205. Indeed, our jury instruction was recently amended to require a finding of intent for a first-degree, felony murder conviction. SCRA 1986, 14–202 (Cum.Supp.1995) (requiring finding that defendant "intended to kill or knew that [his] [her] acts created a strong probability of death or great bodily harm" for felony-murder conviction). Nonetheless, because the evidence presented in this case was such that there can be no dispute that Appellant possessed the requisite intent, we hold that the deficiency in the instruction does not constitute fundamental error. We therefore affirm the conviction for first-degree murder.

■■■ 10. In determining whether the trial court erred by failing to include the essential element of intent in the jury instruction for felony murder, we review whether the error constitutes fundamental error. *State v. Griffin*, 116 N.M. 689, 694, 866 P.2d 1156, 1161 (1993) (applying standard of fundamental error when reviewing whether trial court erred in failing to include essential element of intent in jury instruction for felony murder); *see also Ortega*, 112 N.M. at 566–69, 817 P.2d at 1208–11 (same); *State v. Hernandez*, 115 N.M. 6, 24, 846 P.2d 312, 330 (1993) (same); *State v. Orosco*, 113 N.M. 780, 782–85, 833 P.2d 1146, 1148–1151 (1992) (applying standard of fundamental error in reviewing whether trial court erred in failing to include essential element of "unlawfulness" injury instruction for criminal sexual contact of minor). "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *Orosco*, 113 N.M. at 784, 833 P.2d at 1150. When a

court's error constitutes fundamental error, justice requires the conviction be reversed. *Id.* at 785, 833 P.2d at 1151. However, we have held that a conviction will not be reversed

> when a jury's finding that a defendant committed the alleged act, under the evidence in the case, necessarily includes or amounts to a finding on an element omitted from the jury's instructions, any doubt as to the reliability of the conviction is eliminated and the error cannot be said to be fundamental.

*Id.* at 784, 833 P.2d at 1150.

11. We find that the State presented evidence which established that Appellant intended to kill or knew that his actions "created a strong probability of death or great bodily harm" to Chapman. *Ortega,* 112 N.M. at 563, 817 P.2d at 1205. Al Faudie testified that shortly after he arrived to work the morning of the killing, he heard Chapman's and another person's voices inside the bowling alley. Faudie heard Chapman shout "Al, call the cops, he has a gun!" Faudie then heard another voice say, "I told you to get down on the floor," and then heard gun fire.

12. During a telephone conversation with Elvis Delaney, Appellant admitted killing somebody at a bowling alley and indicated that he shot the person because "The guy wanted to play hero."

13. James Hall had met Appellant in July 1991 while both were being held in jail in Florida. During the time they spent together, they each spoke of the crimes they committed. Hall testified that Appellant told him that he shot a man at a bowling alley in Rio Rancho, New Mexico. Appellant described the shooting to Hall in detail, explaining that he had waited at the back door of the bowling alley for someone to come out. When someone finally came out the door, Appellant said he forced his way into the bowling alley at gunpoint. Appellant said that the man he had at gunpoint began hollering and telling another man down the hall to call the police. Appellant said that he got nervous and fired a warning shot to show the man he meant business. When the man shouted, "Call the police," Appellant said that he shot the man in the head at point-blank range.

14. On different occasions Appellant told David Clark that he committed a homicide in New Mexico. Appellant explained that when he was burglarizing a bowling alley, somebody came into the building. Appellant pulled his gun and told the person to stop. The man refused to stop, so Appellant shot him in the shoulder. On Appellant's way out of the building, he decided he did not want to leave any witnesses, so he went back into the bowling alley and shot the man in the head.

15. In this case, the jury was instructed on both first-degree, premeditated murder and first-degree, felony murder, and it returned a general verdict convicting Appellant of first-degree murder. The evidence presented at trial indicates that Appellant shot Chapman because he "wanted to play hero," to eliminate a witness to his actions, or to show Chapman that he "meant business." While it is true that the testimonies as to Appellant's explanation of the killing may be inconsistent with each other, we trust the jury properly weighed each version in its deliberations. *See State v. Motes,* 118 N.M. 727, 730, 885 P.2d 648, 651 (1994) (noting that jury task is to weigh all evidence presented to arrive at verdict). In either scenario, there is sufficient evidence for the jury to conclude that Appellant killed Chapman with the requisite intent and any deficiency in the jury instruction is inconsequential. On these facts, we hold that the failure of the trial court to instruct the jury on the element of intent for first-degree, felony murder does not constitute fundamental error. *Orosco,* 113 N.M. at 784, 833 P.2d at 1150 (stating that error in failing to instruct jury on essential element of crime for which defendant has been convicted, where there can be no dispute that element was established, does not require reversal of conviction). Indeed, reversing a conviction for a new trial would be a miscarriage of justice when the outcome would surely be the same. *Griffin,* 116 N.M. at 695, 866 P.2d at 1162.

16. Because of the foregoing holding, we need not address Appellant's argument that defense counsel's failure to object to the in-

correct felony murder jury instruction constitutes ineffective assistance of counsel.

### III.

17. Next, we address whether the imposition of sentences for both first-degree murder and aggravated burglary in this case violates the constitutional guarantee against double jeopardy. Appellant is effectively contending on appeal that in being sentenced to life imprisonment for first degree, felony murder and to nine years for aggravated burglary, he is twice being punished for the same offense. We disagree that Appellant's constitutional rights have been violated.

18. The fifth amendment of the United States Constitution provides that no "person be subject for the same offence to be twice put in jeopardy of life or limb. . . ." U.S. Const. amend. V. New Mexico, of course, provides that same protection. N.M. Const. art II, § 15 (no person shall "be twice put in jeopardy for the same offense"). The protection against double jeopardy

> protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. *And it protects against multiple punishments for the same offense.*

*Swafford v. State,* 112 N.M. 3, 7, 810 P.2d 1223, 1227 (1991) (emphasis added) (quoting *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656 (1969). The relevant question here is whether Appellant is being punished twice for the same offense.

19. In *Swafford* this Court adopted a "two-part test for determining legislative intent to punish." 112 N.M. at 13, 810 P.2d at 1233. The first part tests "whether the conduct underlying the offense is unitary, i.e., whether the same conduct violates both statutes." *Id.* The second part tests "whether the legislature intended to create separately punishable offenses. Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial." *Id.*

20. In determining whether Appellant's conduct is unitary, we must "determine whether the conduct for which there are multiple charges is discrete (unitary) or distinguishable." *Id.* at 14, 810 P.2d at 1234. Specifically, we inquire into whether "two events are sufficiently separated by either time or space (in the sense of physical distance between the places where the acts occurred) . . . [or whether] the quality and nature of the acts or . . . the objects and results involved" can be distinguished. *Id.* at 13–14, 810 P.2d at 1233–34; *State v. Contreras,* 120 N.M. 486, 490, 903 P.2d 228, 232 (1995).

21. Applying the foregoing test to this case, we can distinguish between the acts leading to Appellant's convictions for aggravated burglary and first-degree murder and thus find no double jeopardy. The facts leading to Appellant's conviction for aggravated burglary indicate that Appellant unlawfully entered Ideal Lanes intending to commit a theft while inside and that he was armed with a deadly weapon at the time. *See* section 30–16–4(A) (requiring that aggravated burglary consists of unauthorized entry into structure with intent to commit felony or theft inside while armed with deadly weapon). At the moment that Appellant gained access to the bowling alley, he had committed the felony of aggravated burglary. *Cf. State v. Kersey,* 120 N.M. 517, 523, 903 P.2d 828, 834 (1995) (holding that offenses of kidnapping and murder were not unitary because conduct required to establish kidnapping was completed before act of murder). This act was distinct from what transpired afterward and up to the point that Chapman was fatally shot. The evidence indicates that Appellant first shot Chapman either because Chapman hollered to Faudie "Al, call the cops, he has a gun," or to eliminate Chapman as a witness to the theft. In either event, the shooting occurred after Appellant unlawfully entered the bowling alley with the requisite intent to commit a felony while armed.

22. Having found that the two acts were not unitary but were instead distinct, we need not inquire further into whether the legislature intended to create separate punishable offenses. *Swafford,* 112 N.M. at 14,

810 P.2d at 1234 (stating that if conduct is unitary, "inquiry is at an end"); *Kersey*, 120 N.M. at 522, 903 P.2d at 833 (stating that if Court "find[s] the conduct is not unitary, then we need not proceed to the second prong" determining legislative intent). Accordingly, we find no double jeopardy violation.

## IV.

23. Finally, we address whether the State violated the 120–day limit required by the Interstate Agreement on Detainers, Section 31–5–12, art. 4(C) (the "IAD"), for commencing Appellant's trial. The IAD "prescribes procedures by which a prisoner may demand the prompt disposition of charges pending against him in a state other than the one in which he is imprisoned, as well as procedures by which a state may obtain for trial a prisoner who is incarcerated in another state." Donald M. Zupanec, Annotation, *Validity, Construction, and Application of Interstate Agreement on Detainers*, 98 A.L.R.3d 160, 166 (1980). Further, its purpose is "to encourage the expeditious and orderly disposition of such charges and determinations of the proper status of any and all detainers based on untried indictments, informations or complaints," and "to provide such cooperative procedures." Section 31–5–12, art. 1. The IAD provides in relevant part:

A. The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending is entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with Article 5 A of this agreement upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated, . . . .

. . . .

C. In respect of any proceeding made possible by this article, trial shall be commenced *within one hundred twenty days of the arrival of the prisoner in the receiving state, but for good cause* shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

Section 31–5–12, art. 4 (emphasis added). Of central importance in the IAD is that it helps secure a speedy trial of prisoners incarcerated in other jurisdictions. Zupanec, *supra* at 167. Appellant argues that the trial court without good cause exceeded the 120–day limitation before his case was sent to trial and his case should therefore be dismissed.

24. Prior to his indictment on a charge of murder, Appellant was serving an unrelated sentence in a Florida prison. Appellant was extradited to New Mexico to answer a charge of murder, and he arrived on September 19, 1993. His indictment followed on October 21, 1993. Under the IAD, which requires a trial to commence within 120 days of his arrival into New Mexico, Appellant's trial would have had to commence on or before January 19, 1994, but did not. Indeed, there is no dispute that the 120–day limit prescribed by the IAD was initially surpassed. Rather, Appellant contends that the trial court did not have "good cause" in continuing his trial.

25. The delay stems from a motion filed by the State on January 10, 1994. On that date, after having filed a motion requesting trial be set on or before January 19, 1994, the prosecuting attorney filed a motion requesting the trial be continued. As "good cause" for the continuation, the State contended that on December 6, 1993, it discovered that the grand jury that indicted Appellant included an unsworn juror. The State explained that although it did not believe that Appellant was prejudiced as a result of the unsworn juror, it did not want to "take any chances" and elected to correct the deficiency by empaneling a new grand jury in order to reindict Appellant. In deciding to grant the continuance, the trial court considered the fact that the State did not discover the deficiency in the indictment until December 6. The court also considered that a six-week lead time is required to empanel a new grand jury. The court apparently believed this was significant because a grand jury could not have been empaneled any sooner had the State requested a new grand jury when the deficiency was discovered. The court also

considered the fact that counsel for Appellant indicated his intention to challenge the purported defective indictment. When asked by the trial court, defense counsel stated he believed the indictment was defective and would file a motion that day to that effect. Although defense counsel did not file any motions whatsoever, he did say that he "would make the argument that [the indictment] is defective." The trial court agreed with the State and defense counsel that there was no case law regarding the validity of the indictment but agreed with the State that the possibility of a defect indictment warranted a continuance and a new indictment, which at the time appeared to be the only alternative short of proceeding to trial on a possibly defective indictment. Consequently, the trial court determined that there was "good cause" and granted the motion to continue the trial, which commenced April 15, 1994.

26. The IAD does not define "good cause." Our research reveals a host of well-reasoned New Mexico cases that discuss the IAD time limitations. *See, e.g., State v. Montoya,* 119 N.M. 95, 888 P.2d 977 (Ct.App. 1994) (holding that defendant waived IAD time limitation by waiving six-month rule), *cert. denied,* 119 N.M. 168, 889 P.2d 203 (1995); *State v. Aaron,* 102 N.M. 187, 192, 692 P.2d 1336, 1341 (Ct.App.1984) (holding that there was good cause to continue defendant's trial when assigned judge was appointed to Supreme Court and all other judges had full dockets); *State v. Shaw,* 98 N.M. 580, 651 P.2d 115 (Ct.App.1982) (holding that 180–day limitation did not begin anew after second indictment, that 180–day limitation was not tolled between dismissal of first indictment and reindictment, and that defendant's motions did not justify delay in prosecution); *State v. Alderete,* 95 N.M. 691, 625 P.2d 1208 (Ct.App.) (discussing 180–day limit for bringing defendant to trial was not violated where delay was caused by delay in defendant's psychiatric examination), *cert. denied,* 94 N.M. 674, 615 P.2d 991 (1980); *State v. Quiroz,* 94 N.M. 517, 612 P.2d 1328 (Ct.App) (holding that IAD did not apply when defendant was released from sending state before expiration of 120–day limit), *cert. quashed,* 94 N.M. 675, 615 P.2d 992 (1980). As in the foregoing cases, we examine the totality of the circumstances when reviewing for good cause in granting a continuance under the IAD. *See, e.g., State v. Buhl,* 269 N.J.Super. 344, 635 A.2d 562 (App.Div.1994) (quoting *State v. Lippolis,* 107 N.J.Super. 137, 257 A.2d 705 (App.Div.1969) and stating "whether good cause exists ... must be resolved from a consideration of the totality of circumstances in [a] particular case").

27. The IAD provides that the agreement "shall be liberally construed so as to effectuate its purposes" to encourage the expeditious and orderly disposition of untried charges. Section 31–5–12, art. 9; *see also Shaw,* 98 N.M. at 585, 651 P.2d at 120. Nevertheless, we are satisfied from the record before us that there was good cause in granting the continuance.

## V.

28. We hold that there was sufficient evidence to support a conviction of first-degree felony murder. We also hold that the Appellant's offenses of aggravated burglary and first-degree murder were not unitary, and thus his resulting sentences do not constitute a violation of double jeopardy. Finally, we hold that the State did not surpass the 120–day limit set forth in the IAD without first showing good cause. Appellant's convictions are therefore affirmed.

29. **IT IS SO ORDERED.**

SERNA, J., and GERARD W. THOMPSON, District Judge (Sitting by designation), concur.