F I L E D
United States Court of Appeals
Tenth Circuit

JAN 8 1998

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

RAYMOND LUCERO,

        Petitioner-Appellant,

v.

DARELD L. KERBY, ATTORNEY
GENERAL OF THE STATE OF NEW
MEXICO,

        Respondents-Appellees.

No. 95-2263

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CIV-90-911-SC)

Roger A. Finzel, Assistant Federal Public Defender, Albuquerque, New Mexico,
for Appellant.

Patricia A. Gandert, Assistant Attorney General (Tom Udall, Attorney General,
with her on the brief), Attorney General's Office for the State of New Mexico,
Santa Fe, New Mexico, for Appellee.

Before **LUCERO, LOGAN,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

Petitioner Raymond Lucero appeals the district court's dismissal of his federal habeas corpus petition, brought pursuant to 28 U.S.C. § 2254, following his convictions and sentencing in state court for aggravated burglary and criminal sexual penetration charges. On appeal from the dismissal of his habeas petition, petitioner asserts (1) the state trial court violated his Sixth Amendment right to trial by an impartial jury when it denied his motion to dismiss the jury venire or conduct individual, sequestered voir dire after it was learned that one of the jury venire was the brother of one of the victims of the charged offenses; (2) he was denied his Sixth Amendment right to compulsory process for obtaining witnesses when the trial court denied his motion for a continuance to secure a witness essential to his misidentification defense; (3) he was denied his constitutional right to a full and fair hearing on the issue of the voluntariness of his inculpatory statements, and the trial court's admission of his statements violated his Fifth Amendment rights; (4) the evidence introduced at trial was insufficient to support his convictions; (5) the trial court violated his due process right to a fair trial when it permitted the joinder of two separate criminal informations alleging dissimilar facts surrounding the charged offenses; (6) his consecutive sentences for the criminal sexual penetration and aggravated burglary convictions violated his right against double jeopardy; and (7) he was denied his Sixth Amendment

right to effective assistance of counsel due to his trial attorney's deficient performance. This court has jurisdiction pursuant to 28 U.S.C. § 2253. In reviewing the denial of petitioner's habeas corpus petition, we review the district court's conclusions of law de novo. *See Matthews v. Price*, 83 F.3d 328, 331 (10th Cir. 1996). We reverse the district court's ruling on petitioner's double jeopardy claim as to one of petitioner's convictions, but affirm on the remaining issues.[1]

## FACTS

In 1986, petitioner was charged with four counts of aggravated burglary, three counts of second-degree criminal sexual penetration (CSP II), one count of attempted CSP II, and one count of third-degree criminal sexual penetration (CSP III). The charges arose from four rapes and one attempted rape that occurred in Clovis, New Mexico, between December 1985 and July 1986.

At trial, each of the rape and attempted rape victims testified. Karen Schneider testified that on December 15, 1985, at about 7:15 p.m., she was

---

[1]Petitioner has moved this court for issuance of a certificate of probable cause to appeal. Because he filed his habeas corpus petition before the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), he does not need a certificate of appealability to proceed. *See United States v. Kunzman*, 125 F.3d 1363, 1364 n.2 (10th Cir. 1997). Therefore, pursuant to the requirements of 28 U.S.C. § 2253 in effect at the time petitioner filed in the district court, we grant a certificate of probable cause and proceed to the merits of petitioner's appeal.

3

removing clothes from the clothesline when she was grabbed from behind. The attacker placed his arm around her waist and his hand over her mouth. When she screamed, he told her several times, "Shut up, shut up. Shut up, bitch, or I'll kill you." He instructed her to open the door, then pushed her inside and told her to turn off the lights. He continued to push her into the bedroom and onto the bed, and then told her, "Now I'm going to rape you."

Schneider testified that he then removed her underpants, began to lick the backs of her legs and buttocks, inserted a finger into her vagina, and then inserted his penis into her vagina. He then pulled her upright and again pushed her through the house, forcing her just past the front door. They began struggling, and he held something against her neck which she was unable to identify. She told him she would keep her eyes closed if he wouldn't kill her, to which he responded, "You promise? You promise?" She answered, "Yes." He then threw her on the floor, so that she "skidded about six to eight feet on [her] face," and he ran out the door.

Although her attacker remained behind her throughout the entire attack, Schneider was able to describe him from brief glimpses as dark-haired, about 5'6" tall, with an average build. She also stated that he had a deep voice and that she detected no accent.

Dena Shaw testified that on March 7, 1986, at about 8:05 p.m., she had just

4

returned home when she noticed the living room light had gone out. When she entered the living room, someone grabbed her from behind, placing his arm around her waist and his hand over her mouth. He told her to "Shut up, shut up," or he would kill her, and he pushed her toward her bedroom, telling her to turn off the light. She turned off the light, and they "just stood right there." Remaining behind her, he undid her pants, pulled her pants and pantyhose down, and started caressing her. She testified that he then "penetrated [her] with his finger, told [her] to lay down." As she was laying down, she tried to lay sideways, but he pushed her down so that she was face-down on the floor. He then penetrated her vagina with his penis. After ordering her to stay on the floor, he left through the back door. Shaw testified that the entire episode lasted about ten minutes. Based on brief glimpses of her attacker, Shaw testified that he was dark-haired and about 5'6" or 5'7" tall. She also testified that he had a deep voice and a Spanish accent.

Elizabeth Trujillo testified that on June 6, 1986, at about 11:00 p.m., she was walking home when someone grabbed her from behind. The attacker placed an arm around her waist and a hand over her mouth and pushed her into an alley. As he was pushing her, his hand slipped from her mouth and she started screaming. He told her, "Shut up, shut up or I'll kill you," and then picked her up and took her farther into the alley, pushing her against a fence. He asked her if

5

she had made love before and how old she was. He touched her breast and unzipped her pants, and told her to pull down her pants. He inserted a finger, and then his penis, into her vagina. Then he sat her near a dumpster, told her not to turn and look at him or he would kill her, and he ran away. Although her attacker remained behind her throughout the attack, Trujillo testified that she was able to see that his arm was dark-complected and that he was about 5'6" to 5'8" tall. She also stated that he had a low-pitched voice, a Spanish accent, and he smelled of alcohol.

Lori Lambert testified that on July 10, 1986, at about 10:00 p.m., she was at home in her bedroom trying on clothes. While she was trying on a leotard, the bedroom lights went out, and someone grabbed her from behind with an arm around her waist and another arm around her neck. The attacker told her to "shut up, shut up," or he would kill her, and she fell to the floor. She felt a sharp object near her breast. He said he was going to "hurt [her] bad," and he told her to take off her clothes. She began to try to talk him out of it and continued trying to talk to him throughout the entire attack. He responded several times.

They struggled, and she testified that she "ma[d]e it out of the bedroom towards the door, which leads into the living room." He at first pulled her back, but then said, "Yes, go ahead and go in there," and he pushed her into the living room. She then hit the floor in the living room. She was trying to crawl to the

6

front door when he started "manipulating [her] breasts with his hands" and telling her he wanted to "make love" to her. She again tried to talk him out of it. He then penetrated her vagina with his fingers. She screamed; he told her to shut up. Her head hit the floor again. She testified that at this point she was on her knees, with his left arm around her. She again tried to talk to him and calm him down. He talked to her for a moment, but he then became angry and told her again to "shut up, shut up."

She then tried to crawl to the front door. She screamed and he told her to shut up and not to look at him. He then banged her head on the floor again by her hair. She continued to try to talk to him. She testified that she was then on her stomach; he told her to turn over, then changed his mind and said, "No, don't." She then felt that he was naked behind her. He told her to spread her legs; she told him she could not spread them any farther. He then penetrated her vagina from behind with his penis once or twice. After this, he leaned back on his knees. She said, "Don't hurt me," and he said, "I won't." After talking for a few more moments, he picked her up by her arm and pushed her back towards the bedroom. He left by pushing her into the bedroom and then running out the back door.

Based on brief glimpses of her attacker, Lambert described him as dark-haired, about 5'7" to 5'9" tall, with an odor of alcohol on his breath. She also testified that he had deep voice and a Spanish accent.

7

Vicki Lueras[2] testified that on April 3, 1986, at about 9:15 p.m., she had just walked home from next door and was on the telephone in her bedroom when the call was disconnected. When she got up to check the phone line, she saw a man, whom she identified as petitioner, standing in the kitchen doorway about four feet away from her trying to turn off the kitchen light. After he turned off the light, which she stated was "tricky to turn off," he came towards her. He turned off her bedroom light, then pushed her down on her bed and tried to remove her pants. When she screamed for her father, he panicked and ran out the back door.

Lueras also testified that she had first identified petitioner as her attacker when she saw his photograph in the newspaper. She later identified petitioner in a photo array prepared by the police.

In addition to the testimony of the victims, the State introduced several inculpatory statements allegedly made by petitioner. Detective Doug Miller testified as to these statements. Miller testified that in August 1986, petitioner and petitioner's mother came to the police station about another, unrelated matter. Miller stated that petitioner was advised of his rights at that time. Miller testified that, shortly thereafter, petitioner made his first inculpatory statement about this

---

[2]The record is inconsistent as to the spelling of Ms. Lueras' name. We adopt the spelling used in the parties' briefs on appeal.

case while Miller and petitioner were driving in Miller's police car around Clovis.[3] Miller testified that he drove petitioner past the home of Lori Lambert and saw petitioner glance toward the house. Miller then told petitioner that someone had broken in and raped a young girl in that house. He further told petitioner that he had found a set of fingerprints in the house and was going to see if they were petitioner's. At trial, Miller admitted that this statement about fingerprints was false.

Miller testified that petitioner then told him he had broken into the house about two or three years before, but there was no one inside and nothing worth taking, so he left. Miller stated that a few minutes later, however, petitioner said something to the effect of, "All right, all right, I did have sex with her," but he took it back almost immediately, saying, "No, no, I was just joking." They then returned to the police station.

Miller continued to talk to petitioner at the police station. At one point, petitioner again told Miller that he had sex with a girl inside the Lambert house and asked Miller what was going to happen to him. Petitioner, however, then said, "No, no, there've been a lot of rapes in town. I didn't do it." Miller testified that on this same day, petitioner was presented before the magistrate on

---

[3]Miller did not explain at trial how he and petitioner came to be driving around Clovis in Miller's police car.

the other matter for which petitioner had originally come to the police station, and petitioner was placed in jail on that charge.

Miller testified that he again talked to petitioner the following morning. At that time, Miller was told by jail personnel that petitioner was going to be bonded out of jail soon. Miller informed petitioner of his rights, and then asked if he wanted to talk. Petitioner indicated that he was willing to talk. Miller testified he told petitioner that the fingerprints found in the Lambert house had been analyzed and found to be no more than a month or so old. Miller admitted at trial that this was not true.

Petitioner then began to make a statement, at first telling Miller the same story he had recounted the previous day in the car: that he had broken into the Lambert house approximately two years before but had taken nothing. Miller testified petitioner then said that when he was in the Lambert house, he had "looked into the bedroom, and she was undressing, and she was putting on a leotard." Miller told him, "Raymond, that's the rape," and petitioner said, "I know, man."

Miller then started a new statement form and recorded the following statement from petitioner:

> About a month ago, I went to a party that was two
> houses down from the corner of Thirteenth and
> Merriweather. The house belonged to a heavyset
> Spanish male, about 23 or 24 years of age. I had a shot

10

> of whiskey, and I had drank two or three beers. I passed out once for a few minutes.
>
> When I left the house, I went over to the corner house of Thirteenth and Merriweather. I broke into the house by climbing through the back window. I went to the back bedroom. I saw a light on there that was--there was a girl in the bedroom, changing into leotards. She didn't have any underwear on. I turned out the light. Then we were on the ground. She was on her stomach. I entered her from the back. After I climaxed, I left the house through the back door. Then I went back over to the party and had a few more beers.

After Miller finished writing down this statement, Miller asked Kurt Staller, a jail superintendent, to come into the room while Miller read petitioner's statement back to him and again informed petitioner of his rights. Miller obtained petitioner's admission that the statement was accurate and that he had not been threatened or forced to make a statement. He then had petitioner sign the statement in the presence of Staller.

The following day, Miller escorted petitioner to his arraignment.[4] Miller stated that on the way to the arraignment, petitioner said he had a drug and alcohol problem. Miller testified that petitioner further said that when he drank alcohol he would black out and "that must be when he has sex with the girls, but he couldn't remember." Petitioner also told Miller to "please tell them I'm trying to cooperate."

---

[4]Although it is unclear from the record, this arraignment was presumably for the Lambert incident to which petitioner had confessed the previous day.

Miller testified that after the arraignment, petitioner again stated he had a problem with drugs and alcohol, and that he would never break into houses or "have sex with girls without them wanting to" if he weren't drinking. Miller testified he asked petitioner why he was able to remember the incident with Lori Lambert but couldn't remember the others. Petitioner told him that he may have remembered the Lambert incident because Miller had driven him past her house. Miller then asked petitioner if he wanted to see where the other rapes occurred. Petitioner said that he did and said, "I just want them to know I'm trying to cooperate."

Miller testified that he and petitioner then drove together to the vicinity of Karen Schneider's residence. Miller told petitioner that this was where the first rape had occurred in December. Petitioner then pointed in the direction of Karen Schneider's house and said that he remembered blacking out in that area about six months before and waking up on the grounds of a nearby hospital. When Miller drove petitioner past the locations of the Shaw and Trujillo rapes, petitioner remembered nothing.

Miller and petitioner then returned to the police station, where Miller read petitioner his rights and took the following statement from petitioner, which petitioner signed:

> I know I have an alcohol and a drug problem. I know
> when I get drunk, I want to have sex. I know I do not

12

remember what happens most of the time when I get drunk. It is possible that I have had sex with several different girls when I have been intoxicated, and I do not remember. However, I know I never intended to hurt any of the girls. Usually, when I get drunk, I end up walking up and down the streets, and when I do that, I would not remember if I had broken into a house or had sex with anyone.

Detective Miller has shown me a house at Thirteenth Street, close to Thornton Street. He had told me that the girl in that house had reported she was raped about six or seven months ago. I remember about six or seven months ago, I got drunk and I walked west on Thirteenth Street from Main. I do not remember what I did, but I do remember that I woke up under a tree at Thirteenth and Thornton, on the property of the old hospital. I honestly know I need help, and I would never want to hurt anyone else.

In addition to the testimony of the victims and Detective Miller, the State presented serology evidence which was largely inconclusive, although it did not exclude petitioner. Kurt Staller, a jail superintendent, also testified that he witnessed petitioner sign the Lambert confession, that Miller had read the statement to petitioner, and that petitioner said the statement was accurate and that he had not been forced to give the statement.

Petitioner also testified at trial. Petitioner stated that he and his mother went to the police station on an unrelated charge because he heard that Detective Miller had been wanting to talk to him. He was arrested on that charge, taken before the magistrate, and put in jail. Petitioner testified that as he was preparing to be bonded out of jail on the other charge, Detective Miller came "rushing in"

13

and said they had found his fingerprints in a house of one of the rape victims. Petitioner told him he did not know anything about any rapes. Miller then told petitioner to give a statement and told him he better cooperate or it was going to make things harder for him. Petitioner testified that he cooperated by making the statement relating to the Lambert rape and signing his name. Petitioner denied telling Miller that he had a drug and alcohol problem and stated that he did not have a problem with drugs or alcohol. He also denied committing any of the rapes or burglaries.

Following trial, the jury found petitioner guilty of all counts. The trial court sentenced petitioner to nine years imprisonment on each CSP II count and each aggravated burglary count, and three years imprisonment for the CSP III and the attempted CSP II counts. The trial court ordered all sentences to run consecutively, for a total of sixty-nine years imprisonment. Petitioner's convictions were affirmed on direct appeal by the New Mexico Court of Appeals, and his state habeas corpus petition was dismissed. The New Mexico Supreme Court denied certiorari, and petitioner filed this habeas action in federal court. The district court dismissed petitioner's federal habeas corpus petition. Petitioner appeals that dismissal.

I. RIGHT TO IMPARTIAL JURY

Petitioner first contends the trial court violated his Sixth Amendment right

14

to trial by an impartial jury when it denied his motion to conduct individual, sequestered voir dire or to dismiss the jury venire panel on the ground that members of the venire were irreparably tainted by their association with one of the panel members who was the brother of one of the victims.[5]

During jury voir dire, the first question asked by the prosecutor was whether any members of the panel had read or heard anything concerning the charges. The prosecutor further asked members of the venire the source of the information. One of the panel members, Dale Shaw, responded that he had heard about the charges and that the source of his information was his sister. The prosecutor then asked him whether Dena Shaw, one of the victims, was his sister. Mr. Shaw answered, "Yes."

The trial court then called a bench conference, and no further questions were directed at Dale Shaw. At the bench conference, it was discovered that Mr. Shaw had associated with the members of the current jury panel a few weeks earlier during jury qualification for an unrelated case and as a juror in the eight-hour trial of that case. Petitioner's counsel objected to the venire on the ground that its members' prior association with Shaw and their awareness of his

_____

[5]Although petitioner characterizes his argument as a Sixth Amendment violation, his claim implicates both the Sixth Amendment and principles of due process. *See Turner v. Murray*, 476 U.S. 28, 36 n.9 (1986) ("The right to an impartial jury is guaranteed by both the Sixth Amendment . . . and by principles of due process.").

15

relationship as brother to one of the victims tainted the entire panel. Defense counsel requested that a new panel be drawn or that each panel member be sequestered and questioned individually concerning the effects of Shaw's presence on the panel. The trial court denied defense counsel's motion, although taking it under advisement depending on what developed in group voir dire, and ordered that voir dire continue after removing Shaw from the panel.

In the jury voir dire that followed, the prosecutor questioned the panel as to whether any of the members had discussed the facts of the case with Mr. Shaw. Receiving no affirmative response, the prosecutor then asked whether any of the members had any contacts or relationships with Shaw apart from jury duty. Those contacts were minimal.

The prosecutor further questioned the members who had previously served with Mr. Shaw on another jury. He asked them whether, as a result of that service and their knowledge that he was the brother of one of the victims of the charged crimes, their ability to decide petitioner's case solely on the evidence presented at trial and in light of the court's instructions was impaired. There were no affirmative responses to that question. Following the prosecutor's questioning, petitioner's counsel also questioned the members as to the effect their association with Shaw on a previous jury and their knowledge that he was the brother of one of the victims might have on them in this case. Satisfied with the panel members'

16

responses that they could decide the case fairly, the trial court proceeded with jury selection and trial.

On a habeas petition, this court's review of the "state trial court's rulings on juror impartiality is 'limited to enforcing the commands of the United States Constitution.'" *Brecheen v. Reynolds*, 41 F.3d 1343, 1350 (10th Cir. 1994) (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991)). A federal habeas court may reverse a state trial court's findings of juror impartiality only upon a showing of "'manifest error.'" *Id.* (quoting *Mu'Min*, 500 U.S. at 428). This limited review of the state trial court's rulings is based in part on the broad deference traditionally accorded to trial courts in determining jury selection procedures and conducting voir dire. *See Mu'Min*, 500 U.S. at 423. Limited review also acknowledges that "'[t]he state trial judge had the benefit of observing the general demeanor of the jurors as the basis for his general finding'" of impartiality. *Brecheen*, 41 F.3d at 1350 (alteration in original) (quoting *Church v. Sullivan*, 942 F.2d 1501, 1519 (10th Cir. 1991)); *see also Ristaino v. Ross*, 424 U.S. 589, 594-95 (1976). Therefore, to establish a constitutional violation based on the trial court's refusal to allow individual, sequestered voir dire or to dismiss the venire panel, petitioner "must demonstrate either that the trial resulted in actual prejudice or that it gave rise to a presumption of prejudice because it involved 'such a probability that prejudice will result that it is deemed inherently

17

lacking in due process.'" *Brecheen*, 41 F.3d at 1350 (quoting *Estes v. Texas*, 381 U.S. 532, 542-43 (1965)).

Petitioner has not identified any actual prejudice on the part of any juror. Instead, petitioner suggests that prejudice should be presumed because the panel members were aware that "one of their group was closely related to a victim of one of the charged offenses," and because certain panel members had previously served with Dale Shaw on a jury in an unrelated case. Petitioner also suggests that, rather than remedying the problem and resolving any concerns about possible prejudice, the group questioning of the panel concerning any prejudice resulting from their association with Dale Shaw "only served to emphasize the situation."

We conclude that petitioner has failed to establish a presumption of prejudice under the facts of this case. Dale Shaw was immediately removed from the panel when the trial court and attorneys learned that he was related to one of the victims. Although the trial court denied petitioner's motion to conduct individual, sequestered voir dire or to dismiss the panel, the trial court indicated that this ruling was subject to change depending on the outcome of group voir dire. Both the prosecutor and petitioner's counsel had the opportunity to specifically question the members of the panel about their prior association with Shaw and about their ability to remain fair and impartial in this case. None of the prospective jurors indicated that they had discussed petitioner's case with Shaw.

18

Those that had served with Shaw on the prior jury indicated that they could remain fair and impartial despite their prior association with Shaw and despite their knowledge that he was the brother of one of the alleged victims.

"Absent evidence to the contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." *United States v. Easter*, 981 F.2d 1549, 1553 (10th Cir. 1992). As noted by the federal district court, "[p]etitioner seeks to establish a presumption of prejudice from what was, at most, a few days contact in a fairly structured and formal setting. That circumstance is insufficient to establish such a presumption." We conclude petitioner's constitutional right to an impartial jury was not violated.

II.  DENIAL OF CONTINUANCE

Petitioner next asserts he was denied his Sixth Amendment right to compulsory process for obtaining witnesses in his favor when the trial court denied his motion for a continuance to secure a witness essential to his misidentification defense.

Thirteen days before petitioner's trial was scheduled to begin, petitioner's trial counsel discovered an individual in police custody, Albert Chacon, who counsel believed bore a "striking resemblance" to petitioner. Chacon was subsequently returned to Texas on probation violation charges. Petitioner's trial

counsel attempted to secure Chacon's attendance at petitioner's trial, but Chacon refused to waive extradition. Defense counsel therefore moved for a continuance of the trial to secure Chacon's attendance at trial. The trial court denied the motion for a continuance.

When denial of a continuance is asserted as the basis for a habeas petition, the petitioner must show that not only was the denial of the continuance an abuse of discretion, but also that the denial was "'so arbitrary and fundamentally unfair that it violates constitutional principles of due process.'" *Case v. Mondragon*, 887 F.2d 1388, 1396 (10th Cir. 1989) (quoting *Hicks v. Wainwright*, 633 F.2d 1146, 1148 (5th Cir. 1981)). In determining whether the denial was fundamentally unfair, this court focuses on the petitioner's "need for a continuance and the prejudice or lack of prejudice resulting from its denial." *Id.* at 1397.

Petitioner asserts that obtaining the presence of Albert Chacon, "a[n] individual who had been on probation in Clovis during the period in which the rapes occurred and who bore a striking resemblance to [petitioner]," was "crucial to the defense theory of misidentification." Petitioner has not established, however, that he was prejudiced by the refusal to grant a continuance to allow him time to obtain the witness. Petitioner has proffered no evidence to connect Chacon to the crimes for which petitioner was charged apart from asserting that

20

Chacon resembled petitioner and was reportedly on parole in the general area during the time the crimes took place. This is insufficient to show that Chacon was a "crucial" witness.

Further, based on the evidence presented at trial, it is unclear how petitioner's "misidentification" defense would have been significantly furthered by securing Chacon's presence at trial. The primary evidence presented at trial identifying petitioner as the perpetrator of the charged crimes was petitioner's confession to the Lambert rape, petitioner's other inculpatory statements indirectly linking him to the rapes, and Vicki Lueras' eyewitness identification of petitioner as her attacker. Petitioner's "misidentification" defense was only relevant insofar as the State was relying on the Lueras eyewitness identification to connect him to the crimes.

At trial, Vicki Lueras positively identified petitioner as the person who attacked her. After identifying petitioner as the person who assaulted her, Lueras testified as to the opportunity she had during the attack to see her attacker. She testified that when she was attacked, she was able to see her assailant in the light for one-and-a-half to two minutes from a distance of two to four feet. Further, during voir dire, petitioner's counsel was able to present Lueras with a photograph of Chacon. After showing Lueras photographs of both Chacon and petitioner, petitioner's counsel asked Lueras if she could see any similarity

21

between the photographs and asked whether she could have believed Chacon was her assailant if his photograph had appeared in the photo array instead of petitioner's photograph. Lueras emphatically responded that she was positive that petitioner was the person who assaulted her.

Because petitioner has not shown that he was prejudiced by the trial court's refusal to grant the continuance, we conclude the trial court's denial of a continuance did not undermine the fundamental fairness of petitioner's trial.

III. ADMISSION OF INCULPATORY STATEMENTS

Petitioner next asserts he was denied his constitutional right to a full and fair hearing on the issue of the voluntariness of his inculpatory statements because the trial court made its voluntariness determination without allowing petitioner to testify. He further asserts that his inculpatory statements were made involuntarily, and therefore the trial court's admission of the statements violated his Fifth Amendment rights.

During petitioner's trial, the trial court conducted a voir dire hearing concerning the admissibility of petitioner's inculpatory statements to the police. Detective Miller testified as to the inculpatory statements made by petitioner and the circumstances under which petitioner made those statements. His testimony during voir dire was substantially the same as his testimony before the jury.

After Miller testified, defense counsel requested that the court permit

22

petitioner to testify concerning the voluntariness of his inculpatory statements. The trial judge denied his motion, stating that he believed "[t]hat goes farther than the voir dire examination that's been requested." The trial judge also stated that defense counsel had filed a motion to suppress the statements on voluntariness grounds months before and that counsel was "way outside the time limit for putting on proof of this nature."

"[A] defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction." *Jackson v. Denno*, 378 U.S. 368, 376 (1964) (citation omitted); *see also United States v. Janoe*, 720 F.2d 1156, 1164 (10th Cir. 1983). Whether a confession is involuntary is a question of law which this court reviews de novo. *See United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993).

In *Jackson v. Denno*, the Supreme Court held that a defendant who objects to the admission of a confession on voluntariness grounds has a constitutional right to a fair hearing and an independent and reliable determination of voluntariness before the confession is allowed to be heard by the jury. *See* 378 U.S. at 376-77. At this hearing, "both the underlying factual issues and the voluntariness of [the] confession [must be] actually and reliably determined." *Id.*

23

at 380.

The usual remedy for failing to hold a hearing consistent with the requirements of *Jackson v. Denno* is to remand to the trial court for a new hearing on the issue of voluntariness. *See id.* at 393-94. A habeas petitioner is not, however, automatically entitled to a new hearing "merely because he can point to shortcomings in the procedures used to decide the issue of voluntariness in the state courts." *Procunier v. Atchley*, 400 U.S. 446, 451 (1971). Instead, to be entitled to a new hearing on the voluntariness issue, petitioner "must also show his version of events, if true, would require the conclusion that his confession was involuntary." *Id.*

"A defendant's confession is involuntary if the government's conduct causes the defendant's will to be overborne and 'his capacity for self-determination critically impaired.'" *United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)), *cert. denied*, 117 S. Ct. 1699 (1997). "In determining whether the defendant's will was overborne in a particular case, the court examines 'the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation.'" *Id.* (quoting *Schneckloth*, 412 U.S. at 226). Relevant factors "include the age, intelligence, and education of the suspect; the length of the detention and questioning; the use or threat of physical

24

punishment; whether *Miranda* safeguards were administered; the accused's physical and mental characteristics; and the location of the interrogation." *Perdue*, 8 F.3d at 1466. In addition, the court must "consider the conduct of the police officers." *Id.*

Our independent review of the record does not establish that petitioner's inculpatory statements were involuntarily given. Petitioner was advised of his constitutional rights before making the statements, and he initialed and signed a written statement and waiver of those rights. There was no suggestion that the police used violence or improper threats or promises to elicit petitioner's inculpatory statements. *See Bram v. United States*, 168 U.S. 532, 542-43 (1897) (holding confession may not be obtained by threats or violence, direct or implied promises, or improper influence); *Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (same). Although Detective Miller admitted to making false statements about fingerprint evidence found in Lori Lambert's home, such misrepresentations, without more, do not render an otherwise voluntary confession involuntary. *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding interrogator's misrepresentation to suspect that his co-suspect had already confessed did not render suspect's subsequent confession coerced); *see also Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) (holding officer's false statements that police had matched defendant's fingerprints to prints found in victim's van and that two witnesses

25

had identified defendant did not render defendant's confession involuntary, and stating "[a] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is"); *Holland v. McGinnis*, 963 F.2d 1044, 1051 (7th Cir. 1992) ("[O]f the numerous varieties of police trickery . . . a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary.").

Further, petitioner has not alleged any additional facts which, if proven true, would require the conclusion that his statements were made involuntarily. In suggesting that a new hearing would show that his statements were made involuntarily, petitioner raises a number of "unanswered" questions about the circumstances in which the statements were made. Petitioner asserts that his trial "testimony concerning the [voluntariness] issue . . . indicates a far more complicated and conflicting picture surrounding [his] statements than that described by Detective Miller." Petitioner suggests there was "no satisfactory explanation" as to why the police questioned him about the rapes when he went to the police station about an unrelated charge, nor is there an explanation in the record as to how petitioner came to be driven by Detective Miller in a police car to the scene of one of the rapes. Petitioner also suggests as additional grounds for his involuntariness claim "the fact that the written statement was transcribed by Miller in [petitioner's] jail cell after [petitioner] had been incarcerated for the

26

night [and] the fact that these statements occurred over a period of two days while [petitioner] was in custody." Petitioner finally states that he was "a young man with limited education and no experience with the criminal justice system, trying to do the right thing by turning himself in on a breaking and entering charge."

Petitioner's suggestion that, based on "unanswered" questions about the circumstances in which the statements were made, there may be facts to support an involuntariness claim is insufficient to establish his right to a new hearing on the voluntariness issue. In addition, the matters he does reference, even if taken as true, do not require the conclusion that his inculpatory statements were made involuntarily. We therefore conclude that petitioner is not entitled to a new hearing on the issue of the voluntariness of his inculpatory statements and that the statements were properly admitted at trial.

IV. SUFFICIENCY OF EVIDENCE

Petitioner next contends there was insufficient evidence to sustain his convictions arising from the Schneider, Shaw, and Trujillo incidents. Petitioner specifically argues there was insufficient evidence to support the convictions because the State did not present any direct evidence linking petitioner to these crimes, but instead relied only on petitioner's confession to the Lambert offenses, his inculpatory statements connecting him to the Schneider incident, and the alleged similarities between the four rapes. Petitioner further asserts that the

27

similarities between the rapes were not so unique as to establish that petitioner was the perpetrator of all the rapes.

In reviewing a sufficiency of evidence claim, we ask "'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In determining whether evidence is sufficient to support the convictions, we look at both direct and circumstantial evidence. *See United States v. Swallow*, 511 F.2d 514, 520 (10th Cir. 1975). This court "may not weigh conflicting evidence nor consider the credibility of witnesses," but must "'accept the jury's resolution of the evidence as long as it is within the bounds of reason.'" *Messer*, 74 F.3d at 1013 (quoting *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993)).

At trial, the State introduced petitioner's confession to the Lambert offenses and petitioner's inculpatory statements that he had a drug and alcohol problem, that he would black out and have sex with girls when he drank alcohol, and that he once recalled blacking out and waking up near the Schneider residence.

The State also elicited testimony as to the similarities between all the rapes. These similarities include the following: (1) all the attacks took place after dark

28

and before midnight; (2) with the exception of one of the victims, all were attacked in their homes; (3) the attacker grabbed all the rape victims in the same manner, placing his arm around their waist and his hand over their mouth or neck, and he remained behind the rape victims for the duration of the offense; (4) the rape victims were told, "Shut up, shut up, or I'll kill you"; (5) with the exception of the rape that took place in the alley, the attacker turned off the lights or had the victim do so; (6) the penetration was similar in each case, with the attacker penetrating the victim vaginally from behind, first digitally and then with his penis; (7) each attack was brief; (8) the attacker did not request stimulation from the victims; and (9) the attacker did not tear the victim's clothes, removing only the amount of clothing necessary for the assault. In addition, although none of the rape victims was able to identify her attacker,[6] the victims' general descriptions of their assailant, based on brief glimpses during the attack, were consistent with each other and fit petitioner's general appearance: all described their assailant as being between 5'6" and 5'9", having dark hair or being dark-complected, and having a deep voice, and all but one identified their attacker as

---

[6]There was an eyewitness identification by the victim in the Lueras incident. Petitioner, however, challenges the joinder of the Lueras attempted rape to the four rape offenses, arguing that the evidence from the Lueras incident would have been inadmissible in a separate trial of the four rapes. We therefore do not consider the Lueras identification for purposes of petitioner's sufficiency of the evidence argument.

29

having a Spanish accent.

Petitioner argues that these common characteristics identified by the State are not so unique as to establish that he was the perpetrator of those crimes for which no other evidence existed directly identifying him as the perpetrator. Petitioner asserts that many of the characteristics, such as attacking the victims at night and in their own homes and deterring the victims from shouting out by threatening them, are common to most forcible rapes and thus cannot be relied on to establish that petitioner was the perpetrator of all the rapes. In so arguing, however, petitioner overlooks other characteristics identified by the State which are idiosyncratic and unusual, particularly the features of penetration and the similar language used to prevent the victims from shouting out. Viewing the evidence in the light most favorable to the prosecution, we conclude that the characteristics identified by the State, taken together, display "sufficiently distinctive similarities to permit an inference of pattern for purposes of proving identity." *State v. Peters*, 944 P.2d 896, 901 (N.M. Ct. App.), *cert. denied*, 942 P.2d 189 (N.M. 1997); *see also State v. Saavedra*, 705 P.2d 1133, 1134-35 (N.M. 1985) (stating that, for purposes of Rule 404(b), evidence of other crimes is admissible to prove identity "when the similarity of the other crimes to the crime charged 'demonstrate[s] a unique or distinct pattern easily attributable to one person'" (alteration in original) (quoting *State v. Beachum*, 632 P.2d 1204, 1206

30

(N.M. Ct. App. 1981))).

After reviewing all the evidence presented at trial in the light most favorable to the prosecution, we conclude a rational trier of fact could have found beyond a reasonable doubt that petitioner was the perpetrator of the challenged offenses. We therefore reject petitioner's challenge to the sufficiency of the evidence.

V. JOINDER OF OFFENSES

Petitioner next contends the trial court violated his due process right to a fair trial when it granted the prosecution's motion to join two separate criminal informations alleging dissimilar facts in support of the charged offenses.

Petitioner was originally charged by two separate informations. The first information was based on the Schneider, Shaw, Trujillo, and Lambert incidents, and charged petitioner with three counts of aggravated burglary, three counts of CSP II, and one count of CSP III. A second information, based on the Lueras incident, was subsequently filed, charging petitioner with one count of aggravated burglary and one count of attempted CSP II.

Before trial, the State moved to join the offenses charged in the two informations. Under New Mexico law, "[t]wo or more offenses shall be joined in one . . . information . . . if the offenses . . . are of the same or similar character, even if not part of a single scheme or plan." N.M. R. Ann. 5-203(A)(1). Properly

31

joined offenses may be severed, however, if it appears the defendant or State is prejudiced by the joinder. *See id.* 5-203(C).

In its motion to join the two informations, the State argued before the trial court that joinder was proper under Rule 5-203(A)(1) because the offenses were of a "similar character," being either burglary or CSP charges, and because the evidence underlying both informations would likely be cross-admissible in separate trials to establish petitioner's identity. In response, defense counsel argued that joinder would be unduly prejudicial because a jury, faced with the multiple charges and victims and given "the emotion that is involved in the nature" of the CSP offenses, might "gloss over what would be important evidence in regard to a particular count, and conclude that the Defendant is guilty of all." Defense counsel did not contest before the trial court the State's assertion that the evidence underlying both informations would be cross-admissible in separate trials.

Under New Mexico law, the trial court's decision to join the offenses is reviewed for abuse of discretion. *See State v. Gallegos*, 781 P.2d 783, 791-92 (N.M. Ct. App. 1989). To obtain federal habeas relief, however, petitioner must establish not merely that the joinder of the offenses in a single trial was an abuse of the trial court's discretion, but that the joinder violated his federal constitutional rights. *See Nichols v. Sullivan*, 867 F.2d 1250, 1253 (10th Cir.

32

1989) ("[O]ur responsibility is to ensure that [petitioner] was afforded the protections of due process, not to exercise supervisory powers over the New Mexico state courts."). "[I]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder . . . rise[s] to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his . . . right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). In other words, to obtain habeas relief, petitioner must show the joinder of offenses "actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process." *Tribbitt v. Wainwright*, 540 F.2d 840, 841 (5th Cir. 1976); *see also Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993)*; Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991); *Robinson v. Wyrick*, 735 F.2d 1091, 1094 (8th Cir. 1984).

The joinder of multiple offenses in a single trial may result in prejudice to a defendant because "the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged." *Drew v. United States*, 331 F.2d 85, 88 (D.C. Cir. 1964). The jury may also confuse or "cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find." *Id.; see also Herring*, 11 F.3d at 377 (discussing potential prejudice from joinder of offenses); *Close v. Leapley*, 18 F.3d 574, 578 (8th Cir. 1994)

33

(same).

In his habeas petition, petitioner asserts the trial court abused its discretion in joining the informations because evidence of each of the joined offenses would not have been cross-admissible in separate trials. Petitioner further argues the joinder was improper and prejudicial because of "the extremely inflammatory nature of the crimes charged" and the attendant risk that the "the jury would have difficulty dispassionately analyzing the evidence on each count." Petitioner also asserts that the State's case with respect to at least three of the rapes was weak and argues generally that the joinder of the informations "served no other purpose than to allow the jury to infer a criminal disposition on [petitioner's] part and to cumulate the evidence of the various crimes charged and find guilt, when if considered separately, it would not have so found."

Assuming, without deciding, that there was misjoinder of the informations because the evidence underlying each information would not have been cross-admissible in separate trials, we nevertheless conclude petitioner has not made the requisite showing of prejudice to be entitled to habeas relief. "[H]abeas petitioners challenging their state convictions under the general 'fairness' mandate of the due process clause bear an onerous burden. Because of the significant procedural protection provided by direct review through the state system, we will not lightly conclude that state court proceedings were so arbitrary

as to violate due process." *Herring*, 11 F.3d at 378.

We first note that we do not have before us a challenge to the joinder in one information of the four rape and three burglary charges arising from the Schneider, Shaw, Trujillo, and Lambert incidents.[7]  Instead, we are considering only whether the joinder of the two informations was so prejudicial as to deny petitioner's right to a fair trial.

In asserting the State's case with respect to at least three of the rapes was weak, petitioner suggests that by joining the informations the State was relying on a strong evidentiary case, the Lueras case, to obtain convictions in the weaker cases.  In support of this argument, petitioner asserts that "[w]ithout the Lueras offense admitted into evidence at [petitioner's] trial on the four rapes, the state would have had no identification."[8]  Therefore, petitioner suggests that to find him guilty of the rapes, the jury would have had to cumulate the evidence or infer a criminal disposition based on its finding of guilt on the Lueras charges.

Courts have recognized that the joinder of offenses in a single trial may be

---

[7]Petitioner did not object to the joinder of these offenses before trial, nor does he now argue that the joinder of these offenses was improper or prejudicial.

[8]Petitioner's assertion that there was no evidence, independent of the Lueras evidence, identifying petitioner as the perpetrator of the rapes is based on petitioner's contention that all of his inculpatory statements were obtained unconstitutionally.  We have determined, however, that petitioner's inculpatory statements were properly admitted.  We therefore consider this evidence in determining whether the joinder of informations was prejudicial.

35

prejudicial when there is a great disparity in the amount of evidence underlying the joined offenses. *See, e.g., United States v. Foutz*, 540 F.2d 733, 738 (4th Cir. 1976). One danger in joining offenses with a disparity of evidence is that the State may be joining a strong evidentiary case with a weaker one "in the hope that an overlapping consideration of the evidence [will] lead to convictions on both." *United States v. Clayton*, 450 F.2d 16, 19 (1st Cir. 1971).

This is not, however, a case where informations supported by substantially disproportionate amounts of evidence have been joined. In arguing the State was joining a strong case with weak cases, petitioner focuses on the Lueras charges which were supported by strong evidence, namely, Vicki Lueras' eyewitness identification. Petitioner, however, overlooks the strong evidence presented for the Lambert offenses, i.e., petitioner's signed confession. This evidence was as strong as, if not stronger than, the eyewitness identification supporting the Lueras offenses. Although at trial petitioner denied involvement in all the crimes and stated that he had made the Lambert statement because he was directed by the police to "cooperate," the jury was entitled to determine questions of credibility after hearing petitioner's testimony and reviewing the corroborating evidence presented by the State.[9] Petitioner's unconvincing and rather vague explanation

---

[9]For example, the confession was signed by petitioner, and petitioner acknowledged on cross-examination that it was his signature. In addition to Detective Miller's testimony describing the circumstances in which petitioner

of his confession does not detract from the strong evidence of guilt as to the Lambert offenses. Therefore, to the extent petitioner is arguing the joinder was improper and prejudicial because the state was joining a weak information with a strong one and because the State had no evidence identifying him as the perpetrator apart from the Lueras eyewitness identification, we reject his argument.

Petitioner also asserts the joinder of the two informations was prejudicial because of the inflammatory nature of the CSP crimes charged. Petitioner has not explained, however, how the addition of the attempted rape charge to the four rape charges already joined in a single information (and to which joinder petitioner did not object) significantly increased the prejudice to petitioner based on the inherent "inflammatory" nature of CSP offenses. Further, the Lueras attempted rape incident had distinctive facts. The jury could therefore readily

---

made the confession, there was testimony from another witness that the statement was read to petitioner and that petitioner agreed the statement was accurate and voluntarily given. The confession contained unpublicized facts about the Lambert rape, and details in the statement (such as the timing of the offense, the victim's address, and the method of penetration) were consistent with the victim's testimony. The confession was also consistent with other inculpatory statements introduced by the State referring to petitioner passing out when he drank alcohol. In addition, Detective Miller testified as to other inculpatory statements made by petitioner with respect to the Lambert incident, which were also consistent with his written confession to the rape. Miller testified that before making the confession, petitioner twice stated that he had sex with a woman in the Lambert residence, although both times petitioner retracted the statement almost immediately.

differentiate this incident from the four rape incidents.  For example, because there was no opportunity for penetration in the Lueras incident, the similar and most distinctive feature of the rapes, the method of penetration, was not present in the attempted rape.  Additionally, unlike the rape incidents, Vicki Lueras was not grabbed from behind, nor was she told "shut up, shut up, or I'll kill you."  Thus, based on the distinct facts of the Lueras incident, the risk the jury would confuse or cumulate the evidence was not significantly increased by the addition of the attempted rape charge to the four rape charges already joined.  *See Close*, 18 F.3d at 578 (stating federal courts have found "'no prejudicial effect from joinder when the evidence of each crime is simple and distinct . . . [because] the jury can easily keep such evidence separate in their deliberations and, therefore, the danger of the jury's cumulating the evidence is substantially reduced'" (quoting *Drew*, 331 F.2d at 91)); *Herring*, 11 F.3d at 378 (stating risk of jury confusion was significantly limited because evidence with respect to each offense was distinct and easily compartmentalized); *Leach v. Kolb,* 911 F.2d 1249, 1258-59 (7th Cir. 1990) (same).

Finally, there is nothing in the record indicating the jury was unable to compartmentalize the evidence with respect to each count.  Petitioner's three-day trial was not unduly long or complex.  *Cf. Close*, 18 F.3d at 578 (determining there was no danger of jury confusion or undue influence arising from joinder of

38

offenses in part because defendant's trial was short and the evidence of each crime was simple and distinct). Different witnesses testified concerning the different offenses, and the issues were relatively simple. Additionally, petitioner's defenses on each count were not inconsistent. Petitioner's defense and testimony with respect to all the charged crimes was that he did not commit the charged acts. *Cf. id.* (noting possible prejudice arising from joinder of offenses if defendant wishes to present separate defenses to each offense charged or wishes to testify as to some counts but not others); *Corbett v. Bordenkircher*, 615 F.2d 722, 726 (6th Cir. 1980) (holding there was no prejudice from joinder of counts and noting defendant did not contend that the joinder "confounded his defense because he desired to testify as to some counts and not as to others"). Under these circumstances, we conclude petitioner has failed to show that the joinder of the informations resulted in prejudice so great as to deny him a fair trial.

VI. DOUBLE JEOPARDY

Petitioner next asserts his consecutive sentences for the CSP and aggravated burglary offenses violated his right against double jeopardy because "the aggravated burglary charges in this case require[d] proof of the same facts necessary to prove the [CSP] charges" and the CSP charges "were predicate offenses for his aggravated burglary charges."

39

"The Fifth Amendment's guarantee against double jeopardy 'protects against multiple punishments for the same offense.'" *Mansfield v. Champion*, 992 F.2d 1098, 1100 (10th Cir. 1993) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). The Supreme Court has held that in the context of multiple punishment, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983).

Under the traditional double jeopardy test set forth in *Blockburger v. United States*, 284 U.S. 299 (1932), "'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each requires proof of a fact which the other does not.'" *United States v. Raymer*, 941 F.2d 1031, 1043-44 (10th Cir. 1991) (quoting *Blockburger*, 284 U.S. at 304). The Supreme Court has further clarified that so long as each provision "requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes." *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975).

In determining whether a defendant's conduct constitutes a single criminal offense or separate criminal offenses for double jeopardy purposes, we defer to the state court's interpretation of the relevant statutory provisions. *See Mansfield*,

40

992 F.2d at 1100; *Brecheisen v. Mondragon*, 833 F.2d 238, 240 (10th Cir. 1987).

The New Mexico Supreme Court has adopted a two-part test for determining legislative intent as to multiple punishment. *See Swafford v. State*, 810 P.2d 1223, 1233-34 (N.M. 1991). First, the court must inquire as to "whether the conduct underlying the offenses is unitary, *i.e.*, whether the same conduct violates both statutes." *Id.* at 1233. If the conduct is non-unitary, then multiple punishments would not violate the Double Jeopardy Clause. *See id.* If the conduct is unitary, the court must then proceed to the second prong of the test, which "asks whether the legislature intended multiple punishment for unitary conduct." *Id.* at 1234. Under the second prong, "[if] the legislature expressly provides for multiple punishments," there is no double jeopardy violation and the inquiry ends. *Id.* If, however, there is no "clear expression of legislative intent," the court then applies the *Blockburger* test to the elements of each statutory provision. *Id.* "If [the *Blockburger*] test establishes that one statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes--punishment cannot be had for both." *Id.*

Although New Mexico courts have not specifically applied the *Swafford* two-part test to a defendant's convictions for both CSP II and aggravated burglary, New Mexico courts have applied the test in analogous situations. For example, based on the unitary conduct prong of the *Swafford* test, New Mexico

41

courts have held that a defendant may be convicted of both CSP II and kidnapping, where kidnapping was the predicate felony of the CSP charge, so long as there is a separate factual basis for each offense. *See State v. McGuire*, 795 P.2d 996, 1001 (N.M. 1990) (holding no double jeopardy violation for convictions of CSP II and kidnapping because kidnapping was complete "[o]nce defendant restrained the victim with the requisite intent to hold her for service against her will . . . although the kidnapping continued throughout the course of defendant's other crimes"); *see also Swafford*, 810 P.2d at 1234 (discussing New Mexico courts' handling of unitary conduct question in cases involving CSP and kidnapping or false imprisonment). Nevertheless, New Mexico courts have held that where the underlying conduct is unitary, a defendant's conviction for both CSP II and the predicate felony of kidnapping violates the Double Jeopardy Clause. *See State v. Pisio*, 889 P.2d 860, 869-70 (N.M. Ct. App. 1994) (reversing the defendant's conviction for kidnapping where the conduct underlying CSP II and predicate felony of kidnapping was unitary).

Therefore, in considering whether petitioner's conduct constituted a single criminal offense or multiple offenses under New Mexico law for double jeopardy purposes, we first address whether the conduct underlying both charges was unitary. Only if we conclude the conduct was unitary do we reach the second prong of the *Swafford* test.

42

In determining whether the underlying conduct was unitary, we examine the facts presented at trial in light of the elements of the charged offenses. *See Swafford*, 810 P.2d at 1233; *see also State v. Sanchez*, 923 P.2d 1165, 1166-68 (N.M. Ct. App.) (refusing to hold defendant's convictions for CSP II and underlying felony violated Double Jeopardy Clause on face of indictment and stating that "double jeopardy claim must be preceded by a careful review of the evidence so that [the court] can first ascertain whether the offenses comprised unitary conduct"), *cert. denied*, 923 P.2d 1164 (N.M. 1996). Conduct is distinct and non-unitary if the "events are sufficiently separated by either time or space" or if "the quality and nature of the acts or . . . the objects and results involved" are distinguishable. *Swafford*, 810 P.2d at 1233-34.

New Mexico law defines aggravated burglary, for purposes of this case, as an unauthorized entry of a dwelling with the "intent to commit any felony or theft therein" and commission of a battery upon any person in the place entered. N.M. Stat. Ann. § 30-16-4(C). Aggravated burglary is a second-degree felony. *See id.* "Battery" is defined as "the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner." *Id.* § 30-3-4. CSP III is defined as "all criminal sexual penetration perpetrated through the use of force or coercion." *Id.* § 30-9-11(E). CSP II, for purposes of this case, is unlawful sexual penetration perpetrated "in the commission of any

43

other felony." *Id.* § 30-9-11(D)(4).[10]  Attempt to commit CSP II is a third-degree

felony.  *See id.* § 30-28-1.

A.  Vicki Lueras Offenses

Vicki Lueras testified that on the night of April 3, 1986, she was talking on

the telephone in her bedroom when the call was disconnected.  When she got up

to check the telephone line, she saw a person she identified as petitioner in the

kitchen trying to turn off the kitchen light.  After about a minute he was able to

turn off the light.  He then came toward her, backing her into her bedroom.  He

turned off the bedroom light, pushed her down on the bed, and tried to remove her

pants.  She started screaming her father's name, and he panicked and ran out the

back door.  She testified that petitioner was in her house "[f]or about five minutes

altogether."

In this case, because the aggravating factor for the burglary charge was the

commission of a battery upon a person inside the dwelling, the aggravated

---

[10]For purposes of raising CSP III to a second-degree offense, the CSP statute lists a number of enhancing factors in addition to committing CSP during the commission of a separate felony.  For example, when the perpetrator is armed with a deadly weapon, is aided or abetted by one or more persons, or uses force that results in personal injury to the victim, the CSP offense is raised to a second-degree felony.  *See* N.M. Stat. Ann. § 30-9-11(D).

Likewise, a number of factors, including the commission of a battery or being armed with a deadly weapon, can be used to raise the offense of burglary to an aggravated burglary.  *See id.* § 30-16-4.

44

burglary was not complete until petitioner unlawfully entered the victim's dwelling with the requisite intent to commit a felony and committed a battery. *Cf. State v. Livernois*, 934 P.2d 1057, 1063-64 (N.M. 1997) (holding, where aggravating factor of burglary charge was possession of deadly weapon, aggravated burglary offense was complete when, armed with a deadly weapon and with requisite intent, defendant entered building). The jury instructions for the aggravated burglary charge required the jury to find that while inside the victim's dwelling, petitioner "touched or applied force to Vick[i] Lueras in a rude or angry manner." The jury instructions for the attempted CSP II charge required the jury to find that petitioner "began to do an act which constituted a substantial part of the criminal sexual penetration but failed to commit the criminal sexual penetration."

Based on our review of the record, we conclude the conduct constituting the attempted CSP and the aggravated burglary was unitary. First, the acts underlying both offenses were not sufficiently separated in time or space to be considered distinct. *See Pisio*, 889 P.2d at 869 (holding conduct underlying kidnapping, assault, criminal sexual contact, and CSP II charges was unitary where conduct all occurred within same initial five-minute period following victim's entry into apartment)*; cf. State v. Kersey*, 903 P.2d 828, 834 (N.M. 1995) (holding kidnapping and felony murder were distinct acts where kidnapping took

place two hours before and sixty miles away from murder). Lueras' testimony established that the acts constituting the attempted CSP (throwing the victim down on the bed and attempting to undo her pants) and those constituting the battery (the offensive touching) took place simultaneously. The entire criminal episode took place over a short period of time and in the same area. There was no significant movement of the victim. *Cf. Herron v. State*, 805 P.2d 624, 628-29 (N.M. 1991) (holding movement or relocation of victim tends to establish that acts involved in continuous criminal episodes are separate and distinct). The acts underlying the aggravated burglary offense and the attempted CSP offense were also uninterrupted by intervening acts.

In addition, because the criminal sexual penetration was not completed, the acts constituting attempted CSP were not of a different nature than the acts constituting battery. Furthermore, the object and result of the aggravated burglary and attempted CSP were not distinct. The jury instructions required the jury to find, as one of the elements of the aggravated burglary charge, that petitioner entered the dwelling with intent to commit CSP; the State has not suggested, either at trial or before this court, that petitioner entered the victim's dwelling with intent to commit theft or another felony unrelated to CSP. *See State v. Contreras*, 903 P.2d 228, 232 (N.M. 1995) (finding object and result of felony murder and robbery united where, almost immediately after stabbing cab driver,

46

defendant took the cab and its contents); *cf. Livernois*, 934 P.2d at 1063 (holding

conduct underlying felony murder and predicate felony of aggravated burglary not

unitary where defendant entered building with intent to commit theft, but

subsequently committed murder). The evidence presented at trial therefore does

not allow any determination that a separate factual basis existed for each offense.

Instead, the conduct constituting attempted CSP was the same conduct that was

used as the aggravating factor for the aggravated burglary charge, and this

aggravated burglary charge was used to raise the attempted CSP offense to

attempted CSP II.

Because the conduct underlying the Lueras charges was unitary, we must

turn to the second prong of the *Swafford* test, which focuses on legislative intent

to impose multiple punishments for unitary conduct. Our review of New Mexico

case law, the relevant statutes, and available legislative history has revealed no

express authorization of multiple punishment in this context. We therefore turn to

the *Blockburger* test to determine legislative intent.

Under the *Blockburger* test, the court must determine "'whether each

provision requires proof of a fact the other does not.'" *Swafford*, 810 P.2d at

1228 (quoting *Blockburger*, 284 U.S. at 304). If "one statute is subsumed within

the other, the inquiry is over and the statutes are the same for double jeopardy

purposes." *Id.* at 1223. "A statute is subsumed within another if all of the

47

elements of that statute are included within the elements of the other statute."

*Contreras*, 903 P.2d at 232. In this case, because the attempted CSP II charge was premised on the attempted perpetration of the CSP *during the commission of the aggravated burglary*, petitioner could not have been convicted of attempted CSP II unless the State proved all the elements of aggravated burglary. The elements of aggravated burglary are thus subsumed by the elements of the attempted CSP II. *See Pisio*, 889 P.2d at 870 (holding defendant's convictions for CSP II, based on a felony, and predicate felony of kidnapping violated Double Jeopardy Clause where underlying conduct was unitary); *see also State v. McGruder*, 940 P.2d 150, 158 (N.M. 1997) (citing *Pisio* as case in which double jeopardy principles preclude multiple punishment based on unitary conduct for CSP II and kidnapping, where kidnapping is the felony enhancing the base offense).

The State argues there was no double jeopardy violation because CSP was "not a necessary predicate to petitioner's conviction for aggravated burglary." The State points out that "petitioner could have been convicted of aggravated burglary under New Mexico law even if he had not sexually assaulted his victims."[11] Under the same reasoning, because the CSP II statute does not

_____

[11]Even assuming the State's argument is correct, this does not address the problem of using the aggravated burglary charge as the underlying felony for purposes of raising attempted CSP III to attempted CSP II where the aggravated

48

expressly enumerate aggravated burglary as an element of CSP II, but instead

refers generally to CSP perpetrated during the commission of "any other felony,"

aggravated burglary is not necessarily subsumed by the CSP II charge. This

argument has been rejected, however, by both the Supreme Court and by New

Mexico courts in the analogous context of felony murder.[12] *See Whalen v. United*

*States*, 445 U.S. 684, 693-94 (1980) (holding defendant could not be punished for

both felony murder and predicate felony of rape because rape offense was

subsumed within felony-murder offense even though felony-murder statute listed

other felonies which could satisfy felony element); *Contreras*, 903 P.2d at 232-33

(adopting *Whalen* analysis in context of felony murder)*; Swafford*, 810 P.2d at

1228 n.4 (suggesting majority's approach in *Whalen* "may be understood as an

burglary and CSP charges were based on unitary conduct.

[12]The State also relies on *State v. Young*, 579 P.2d 179 (N.M. Ct. App. 1978), in arguing that a defendant's convictions for both CSP II and aggravated burglary do not violate the Double Jeopardy Clause under the *Blockburger* analysis. In *Young*, the New Mexico Court of Appeals held that the defendant could be sentenced for both aggravated burglary and CSP III because "(1) the aggravated burglary and the CSP offenses each required proof of facts which the other did not, and (2) neither offense necessarily involved the other." *Id.* at 181. This case does not control our analysis. First, *Young* did not address whether CSP II (CSP perpetrated during the commission of a separate felony) and aggravated burglary were separate offenses for double jeopardy purposes. Instead, the charges in *Young* were CSP III, which does not require the commission of a separate felony, and aggravated burglary. Second, as discussed above, New Mexico has since altered its analysis for determining legislative intent to impose multiple punishment in the double jeopardy context. *See Swafford v. State*, 810 P.2d 1223, 1233 (N.M. 1991); *State v. Pisio*, 889 P.2d 860, 869-70 (N.M. Ct. App. 1995).

exception to traditional analysis [i.e., strict elements application of *Blockburger*]

designed to cope more effectively with the complicated problem of compound and

predicate offenses").

In the related situation of criminal statutes written in the alternative, New

Mexico courts have also indicated that in applying the *Blockburger* test to

determine legislative intent, the court should "focus on the legal theory of the

case and disregard any inapplicable statutory elements." *State v. Cowden*, 917

P.2d 972, 973 (N.M. Ct. App.), *cert. denied,* 916 P.2d 844 (N.M. 1996). We

therefore reject the State's argument and conclude that petitioner's convictions

for both aggravated burglary and attempted CSP II arising from the Lueras

incident violated the Double Jeopardy Clause of the Constitution. Thus, we

remand to the district court so that the less serious Lueras offense can be

vacated.[13]

B. Schneider, Shaw, and Lambert Offenses[14]

We reach a different result, however, with respect to the charges arising

from the Schneider, Shaw, and Lambert incidents. Application of some of the

---

[13]We assume the less serious Lueras offense is attempted CSP II, for which petitioner was sentenced to imprisonment for a term of three years. However, we leave this for the parties and district court to determine on remand.

[14]Because petitioner was only charged with CSP III based on the Trujillo incident, which occurred in an alley, this incident does not raise any double jeopardy concerns.

factors listed in *Swafford* suggests unitary conduct. For example, Karen Schneider, Dena Shaw, and Lori Lambert each testified that the entire episode was relatively short and took place in the same general area. There was therefore no significant separation of events by time or place. Additionally, viewed generally, the object and result of the initial acts of battery and the acts of CSP were not distinct. As discussed with respect to the Lueras offenses, the jury instructions required the jury to find that petitioner entered the victims' homes with the intent to commit CSP, and there was no indication at trial, nor has the State argued on appeal, that petitioner entered the homes with the intent to commit theft or another felony besides CSP. Further, the initial acts of battery, including grabbing and restraining the victims, pushing them into the bedroom, and pushing them to the floor or the bed, were apparently carried out for the purpose of furthering and completing the goal of committing the CSP.

Other factors, however, indicate that the acts constituting battery for purposes of the aggravated burglary charges and the acts constituting CSP were not unitary. New Mexico courts have stated that the offense of aggravated burglary is complete as soon as the requisite elements have occurred. *See State v. Corneau*, 781 P.2d 1159, 1165 (N.M. Ct. App. 1989) (noting that burglary is not an ongoing offense but is complete once the requisite elements have occurred); *Livernois*, 934 P.2d at 1063 (holding acts leading to defendant's convictions for

51

aggravated burglary and felony murder were not unitary where shooting occurred after defendant completed the offense of aggravated burglary by entering building while armed and with intent to commit felony); *cf. Pisio*, 889 P.2d at 867 (noting that although acts of CSP and acts constituting felony offense may be non-unitary, as long as the CSP "occurs within the res gestae of a felony, then it occurs 'in the commission of' a felony within the meaning of CSP II, felony"). Thus, in the case of aggravated burglary based on battery, the aggravated burglary is complete once the defendant unlawfully enters the dwelling with the intent to commit a felony and commits a battery upon someone inside the dwelling. Additionally, the offense of aggravated burglary does not require that a defendant actually commit a felony after entering the dwelling, but only requires that the defendant enter with the intent to commit a felony. Therefore, in this case, the offense of aggravated burglary was complete as soon as petitioner unlawfully entered the victims' homes with the intent to commit CSP and committed a battery, such as grabbing the victims from behind; the offense did not depend on the actual commission of the CSP.

In addition, the acts of battery and the acts of CSP were of a different quality or nature. The acts of battery included grabbing the victims, covering their mouths to prevent them from screaming, pushing them through the house to the bedroom, pushing them on the bed or floor, and restraining them. These acts

52

are of a different nature than the acts constituting CSP, which requires sexual penetration. *Cf. State v. Mora*, 1997 WL 751254, at \*16-17 (N.M. Nov. 17, 1997) (holding quality and nature of defendant's acts underlying felony murder and criminal sexual contact charges were distinct; the acts of criminal sexual contact resulted in injury to genital area, whereas act of felony murder was fatal blow to victim's head). Further, although some acts of battery, such as restraining the victim while committing the CSP, are necessarily inherent in and therefore inseparable from the act of CSP, other acts of battery which occurred both before and after the acts of CSP are not necessarily a part of the CSP. *See State v. Crain*, 1997 WL 622771, at \*5 (N.M. Ct. App. Aug. 13, 1997) (stating that CSP III cannot be charged as CSP II, based on commission during kidnapping, without some "force, restraint, or deception occurring either before or after the sexual penetration"), *cert. denied*, 944 P.2d 274 (N.M. 1997); *Pisio*, 889 P.2d at 869-70 (same); *Corneau*, 781 P.2d at 1164-65 (same, in context of CSP II and underlying felony of false imprisonment).[15]

---

[15]Although New Mexico courts have recognized that acts of force or restraint occurring both before and after the acts of CSP may be characterized as separate, non-unitary conduct, those acts taking place after the CSP are most plainly distinguishable from the prior CSP. In this case, the victim most clearly testifying as to acts of battery occurring after the act of CSP was Karen Schneider. Schneider testified that after her assailant committed the CSP in the bedroom, he pulled her upright, pushed her through her house to the front door, held an object against her neck, and then pushed her to the floor before he left out the front door. These acts of battery, occurring after the CSP, were sufficiently

There are also other factors, specific to the individual incidents, that indicate the acts underlying the battery and the acts underlying the CSP were separate and distinct. For example, Lori Lambert testified that she struggled several times with her assailant. Lambert testified that after one struggle with her assailant, she made it out of the bedroom and into the living room. The attacker at first pulled her back, but then pushed her into the living room. While in the living room, she again struggled with him and attempted to crawl to the front door. New Mexico courts have indicated that such struggling with the attacker may constitute an intervening event between the initial acts of battery and subsequent acts. *See State v. Cooper*, 1997 WL 736477, at *13 (N.M. Nov. 3, 1997) (holding that acts underlying defendant's convictions for aggravated battery and felony murder were non-unitary where evidence showed that after initial battery victim struggled with defendant; this struggle was an "intervening event" separating the initial battery from the subsequent acts causing victim's death).

---

distinct from the CSP to support the separate charges. The acts occurred after the conduct constituting the CSP was complete. *See State v. Corneau*, 781 P.2d 1159, 1164-65 (N.M. Ct. App. 1989) (stating that "[t]he act of CSP is not a continuing offense; it is completed upon penetration" and therefore the conduct taking place after the completed CSP is separate from the CSP itself). In addition, the acts of CSP and the acts of battery following the completed CSP had a different object and result, as the acts of battery following the CSP were not necessary to accomplish the CSP. *Cf. State v. Mora*, 1997 WL 751254, at *17 (N.M. Nov. 17, 1997) (holding conduct underlying defendant's convictions for felony murder and the predicate felony of criminal sexual contact was non-unitary, in part because "[n]either contact was necessary to accomplish the other").

Thus, the intervening struggles indicate the initial acts of battery were separate and distinct from the subsequent acts of CSP.

In addition, the testimony of two of the rape victims, Lori Lambert and Dena Shaw, indicates that in two of the incidents the assailant's repeated sexual penetrations constituted separate and distinct violations of the CSP statute. In *Herron*, the New Mexico Supreme Court held that although the number of penetrations is not dispositive of the number of violations of the CSP statute, multiple penetrations may constitute separate violations of the CSP statute where each penetration is in some sense distinct under the evidence. *See* 805 P.2d at 628; *see also Pisio*, 889 P.2d at 868 (stating *Herron* provides "proper basis for whether conduct in sex-crime cases is unitary" and should supplement *Swafford* analysis); *State v. Brooks*, 877 P.2d 557, 560 n.1 (N.M. 1994) (affirming *Herron* as appropriate analysis for sex-crime cases). The *Herron* court listed various factors for a court to consider in determining whether the multiple acts are distinct, including the location and position of the victim at the time of each criminal act and distinctions in the manner of committing the criminal acts. *See* 805 P.2d at 628. Applying these factors, the *Herron* court found that two distinct CSP offenses occurred when the defendant in that case forced his victim into a lying position on the floor and inserted his finger into her vagina, and then forced her into a kneeling position and penetrated her vaginally with his penis. *See id.* at

55

629. The court stated that these acts were "sufficiently distinct" to support convictions for two CSP offenses. *Id.*

The testimony of Lambert and Shaw indicates that, under the analysis of *Herron*, there were at least two distinct acts of CSP in both incidents. Lori Lambert testified that after her assailant pushed her into the living room, he penetrated her vagina with his finger. She screamed and he told her to shut up; her head then hit the floor. She testified that at this point she was on her knees with his left arm around her. She tried to talk to him and he responded for a moment, but he then became angry and told her to "shut up, shut up." She then tried to crawl to the front door and she screamed again. He told her to shut up and not to look at him, and he banged her head on the floor again by her hair. She testified that she was then on her stomach. He then told her to spread her legs, and he penetrated her vagina with his penis once or twice.

Based on this testimony, two distinct CSP offenses occurred when the assailant first penetrated the victim's vagina with his finger, and then, after she attempted to break away and to talk him out of further acts, the assailant repositioned her and penetrated her vagina with his penis. Based on *Herron*, therefore, petitioner committed and could have been convicted and punished separately for two distinct CSP offenses based on this incident. *See id.*; *see also Swafford*, 810 P.2d at 1233 ("[I]f the defendant commits two discrete acts

56

violative of the same statutory offense, but separated by sufficient indicia of distinctness, then a court may impose separate, consecutive punishments for each offense.").

Dena Shaw testified that after her assailant pushed her into the bedroom, they were both standing, and he pulled down her pants and her pantyhose. She testified that he then "just kind of started caressing me with his hand. And he penetrated me with his finger, told me to lay down. And as I was laying down, I kind of tried to lay sideways, and he pushed me down to make sure I'd lay face first on the ground." She then heard some noise behind her, "which probably [was him] undoing his pants or something," and he penetrated her vagina with his penis.

Although Shaw's testimony is ambiguous, a reasonable interpretation is that while both Shaw and the assailant were standing, the assailant penetrated the victim's vagina with his finger, and then told her to lay down. She then tried to move to her side but he pushed her so she was face-down on the floor; he then penetrated her vagina again with his penis. As with the Lambert incident, petitioner could have been convicted for two CSP offenses based on this incident.

Because there were two distinct CSP offenses in the Lambert and Shaw cases, even if the initial acts of battery were not distinct from the acts constituting

57

the first CSP offense, there remained a separate act of CSP. Thus, the aggravated burglary was necessarily completed before, and was distinct from, the second act of CSP and the conduct underlying the CSP and aggravated burglary charges was therefore non-unitary. *See Brecheisen*, 833 F.2d at 240-41 (holding, in consecutive prosecution case, that defendant's CSP conviction was not barred by a prior battery conviction arising out of same criminal episode because evidence established three separate battery offenses; the two initial acts of battery were separate and distinct from the third battery which occurred during and which merged with the CSP offense).

We conclude that the evidence presented at trial supports the determination that there was independent factual support for each of the charges arising from the Schneider, Shaw, and Lambert incidents. Therefore, petitioner's convictions and consecutive sentences for both CSP II and aggravated burglary arising from these incidents did not violate the Constitution's proscription against double jeopardy. *See Swafford*, 810 P.2d at 1233.

VII. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner finally argues he was denied his Sixth Amendment right to effective counsel when his trial counsel failed to secure a key defense witness; failed to ensure that petitioner received a full and fair evidentiary hearing as to the voluntariness of his inculpatory statements; and failed to object to petitioner's

consecutive sentences as a violation of his right against double jeopardy.

This court evaluates ineffective assistance of counsel claims using the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Houchin v. Zavaras*, 107 F.3d 1465, 1471 (10th Cir. 1997). To prevail on an ineffective assistance claim under the *Strickland* test, petitioner must show that his attorney's performance "fell below an objective standard of reasonableness" and that the unreasonably deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 688, 691-92. To establish prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. If we determine petitioner has failed to prove prejudice, we need not determine whether counsel's performance was constitutionally deficient. *See id.* at 697.

Petitioner first asserts his trial counsel's failure to secure the presence at trial of a key defense witness, Albert Chacon, denied him effective assistance of counsel. Petitioner states that although his "trial counsel filed a motion to continue the trial for the purpose of securing Chacon's attendance at trial, he did not file an affidavit for a certificate and subpoena to compel the attendance of the witness until the trial began. Had defense counsel filed the affidavit in a timely manner, he may have been able to compel Chacon's attendance at trial." As previously discussed, however, petitioner has failed to show that he was

59

prejudiced by the failure to secure Chacon's attendance at trial. Apart from general assertions, petitioner has not shown that Chacon was a key witness based on some meaningful connection between Chacon and the crimes for which petitioner was convicted. Further, petitioner has not shown how Chacon's presence at trial would have significantly furthered his "misidentification" defense. We therefore reject this claim of ineffective assistance.

Petitioner next argues his trial counsel's performance was deficient based on counsel's failure to ensure that he was accorded a full and fair hearing on the voluntariness of his inculpatory statements. As discussed above, however, petitioner has failed to assert any facts which, even if taken as true, would indicate that his statements were made involuntarily. Therefore, petitioner has failed to establish prejudice arising from the alleged lack of a full and fair voluntariness hearing.[16]

Finally, petitioner asserts his trial counsel's failure to object at sentencing to the imposition of consecutive sentences as a double jeopardy violation denied him his right to effective assistance of counsel. Based on our resolution of

---

[16]Related to this assertion of deficient performance, petitioner further contends his trial counsel's failure to appeal the trial court's denial of his pre-trial motion to suppress his inculpatory statements denied him effective assistance of counsel. As discussed above, however, petitioner has not shown that his statements were involuntarily made and therefore should have been suppressed. There was thus no prejudice resulting from counsel's failure to appeal the denial of his motion to suppress the statements.

60

petitioner's double jeopardy claim above, we need not address this separate claim of prejudice here.[17]

## CONCLUSION

This court concludes petitioner's constitutional rights were not violated by the state trial court's denial of his motion to dismiss the jury venire or to conduct individual, sequestered voir dire, or by the trial court's denial of his motion for a continuance to secure a witness. Furthermore, petitioner's constitutional rights were not violated by the trial court's admission of his inculpatory statements or by the joinder of the informations. Petitioner's convictions were supported by sufficient evidence. Petitioner is not entitled to a new trial based on ineffective assistance of counsel. This court concludes, however, petitioner's convictions for both attempted CSP II and aggravated burglary based on the Lueras incident violated the Double Jeopardy Clause of the Federal Constitution.

The federal district court's judgment on the double jeopardy issue is therefore **REVERSED** as to the Lueras convictions. The remainder of the district

---

[17]Petitioner does not expressly argue that consecutive sentences for separate crimes violates the Double Jeopardy Clause. To the extent that he does make such an argument, however, we reject this claim. As discussed above, the Double Jeopardy Clause prohibits multiple punishments for the same offense in the absence of legislative authorization; the imposition of consecutive sentences for *separate* offenses does not implicate double jeopardy.

61

court's judgment is **AFFIRMED**.  We **REMAND** to the district court for entry of judgment consistent herewith.